John Wesley **CLUTCHETTE** et al.,
Plaintiffs,

v.

Raymond J. **PROCUNIER** et al.,
Defendants.

No. C–70 2497.

United States District Court,
N. D. California.

June 21, 1971.

Floyd Silliman, Salinas, Cal., William Bennett Turner, Alice Daniel, San Francisco, Cal., Fay Stender, Berkeley, Cal., John Thorne, San Jose, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen. of California, William D. Stein, Deputy Atty. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

This civil action is brought pursuant to 42 U.S.C. Section 1983 to seek relief for state prisoners from alleged deprivation of their constitutional rights secured by the due process and equal protection clauses of the 14th amendment by state prison officials in prison disciplinary hearings. More specifically, they allege that the procedures by which charges of violations of prison rules are adjudicated do not contain sufficient due process safeguards, consistent with the nature of the potential punishment, to meet the standards of the 14th amendment. Plaintiffs seek a declaratory judgment, preliminary and permanent injunctive relief and damages for plaintiff Clutchette.

The complaint was filed on November 20, 1970. On the same day, the court issued an order to defendants requiring them to show cause why a preliminary injunction should not be granted enjoining certain disciplinary proceedings and punishments.

On December 3, 1970, plaintiffs filed an amended complaint. Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b) (1) and Rule 23(b) (2) of the Federal Rules of Civil Procedure, on behalf of all other inmates

of San Quentin State Prison affected by the disciplinary practices and punishments challenged in this case.

On December 4, 1970, a hearing was conducted on plaintiffs' motion for a preliminary injunction. At the hearing plaintiffs called Mr. John Apostol, a program administrator employed by defendants at San Quentin Prison. In addition, certain documentary evidence was introduced and the court requested that the parties file briefs on the issues.

## INTRODUCTION

At the heart of this case lies the serious question of the extent to which federal courts should intervene in the administration of state prisons generally, and the procedures for maintenance of discipline more specifically. Traditionally, this area has been relatively free from court intervention, absent unusual circumstances. *See, e. g.,* Snow v. Gladden, 338 F.2d 999 (9th Cir. 1964). However, it is well settled that "a prisoner of the state does not lose all his civil rights during and because of his incarceration. In particular, he continues to be protected by the due process and equal protection clauses which follow him through the prison doors." Jackson v. Bishop, 404 F.2d 571, 576 (8th Cir. 1968) (Blackmun, Cir. J.). Violations of these rights are cognizable in federal courts under 42 U.S.C. § 1983. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

Recently, federal courts have subjected state prisons to increasingly stricter scrutiny. In Jordan v. Fitzharris, 257 F.Supp. 674 (N.D.Cal.1966), Judge Harris of this court held that certain conditions in the California State Penitentiary at Soledad were in violation of the "cruel and unusual punishment" clause of the eighth amendment.[1] A three-

1. *See also* Brenneman v. Madigan, C–70 1911, filed Sept. 8, 1970, wherein this court inquired extensively into conditions existing in the Greystone section of Alameda County Rehabilitation Center at Santa Rita.

2. This case has been reversed in part on appeal, Sostre v. McGinnis, 442 F.2d 178

judge court of this district ruled that prison law libraries must meet certain minimum requirements so as to insure access to the courts. Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970). Regulations providing for opening and censoring of prisoners' mail are currently under attack, Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971), and this court recently held that the first amendment requires prison officials to provide copies of the Holy Qu-ran and Black Muslim ministers at state expense for Black Muslim prisoners, and may not exclude copies of Muhammad Speaks. Northern v. Nelson, 315 F.Supp. 687 (N.D.Cal.1970).

In other districts, courts have applied traditional due process standards to prison disciplinary proceedings and found them seriously inadequate. See Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970);[2] Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D. N.Y.1970); Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969). In short, it is now well settled that federal courts have jurisdiction under 42 U.S.C. § 1983 to examine into conditions at state prisons when allegations of unconstitutional deprivations are made.

## I. PROCEDURAL CONSIDERATIONS

At the hearing, defendants argued that plaintiffs had not exhausted their state remedies and that this case is a proper case for convening a three-judge court pursuant to 28 U.S.C. § 2281. In their post-hearing brief they have further argued that this court should abstain from deciding the issue. None of these contentions has any merit.

(2 Cir., 1971) (en banc). For reasons more fully set out in footnote 9, this court is not persuaded by the majority's decision on the due process issues involved. However, even in reversing the District Court, the Second Circuit recognized the appropriateness of federal court intervention in such matters.

## A. *Exhaustion of State Remedies*

"We yet like to believe that wherever the Federal courts sit, human rights under the Federal Constitution are always a proper subject for adjudication, and that we have not the right to decline the exercise of that jurisdiction simply because the rights asserted may be adjudicated in some other forum." McNeese v. Board of Education, 373 U.S. 668, 674, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), quoting from Judge Murrah's decision in Stapleton v. Mitchell, 60 F.Supp. 51 (D.Kan.1945).

With these lines, the Supreme Court laid to rest any doubt that might have remained regarding the vitality of the exhaustion doctrine in actions brought under the Civil Rights Act. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1967), actually established this position two years prior, but it took *McNeese* to seal the lid on the coffin of exhaustion. Since that time, federal courts have leapt headlong into the adjudication of prisoners' rights in suits brought under the Civil Rights Act, as the cases cited throughout this opinion indicate. At this stage of the development of prisoners' rights under the Constitution, it would be unwise and inappropriate for this court to return to a doctrine designed to promote harmonious relations between sovereigns, at the expense of the timely adjudication of human rights.

## B. *No Three-Judge Court is Required in this Case*

When a federal court is asked to enjoin the enforcement of a state statute or regulation of statewide application, 28 U.S.C. § 2281 requires the convening of a three-judge court. But when the practice challenged is not of statewide application, a three-judge court is not required. Thus, in Hatfield v. Bailleaux, 290 F.2d 632, 635 (9th Cir. 1961), the Ninth Circuit held that a three-judge court was not required in a case challenging an Oregon prison regulation, even though the challenged regulation had been promulgated pursuant to authority conferred by statute, and had subsequently been approved by the Oregon State Board of Control as required by that statute.

Similarly, in Gilmore v. Lynch, 400 F.2d 228 (9th Cir. 1968), the court held that a three-judge court should be convened to hear a challenge to a state regulation establishing rules to be followed in every prison in the state, but stated that a challenge to certain prison practices at San Quentin which were not statewide in application was not properly a subject of three-judge court jurisdiction.

Plaintiffs in the case at bar are not challenging the constitutionality of any rule or regulation of statewide application. The only state regulations which are even arguably relevant, the Director's Rules and Inmate Classification Manual, neither mandate the specific procedures challenged here nor prohibit the procedures requested by the plaintiffs. In short, no state regulations speak to the subject at all, and their validity is not an issue in this case.

At the hearing of this case the Attorney General argued that, once approved by the Director of Corrections, the San Quentin Institution Plan became equivalent to a state regulation. That precise theory was considered and rejected by the Court in Hatfield v. Bailleaux, *supra*. Moreover, it is contradicted by the language of Director's Rule 4502 which, by requiring each institution to prepare an inmate disciplinary plan, clearly contemplates diversity of practice among the several prisons of the state.

For these reasons, 28 U.S.C. § 2281 has no application to this case and is no bar to a single judge reaching the merits of plaintiffs' claims.

## C. *The Abstention Doctrine Does Not Apply*

The doctrine of abstention—that is, a decision by a federal court not to decide a case properly within its jurisdiction—is limited to certain circumstances. Federal courts have abstained from deciding constitutional questions

properly before them (1) to avoid decision of a federal constitutional question when the case may be disposed of on questions of state law; (2) to avoid needless entanglement in complex state regulatory schemes; and (3) to allow the state courts an opportunity to give constitutionally questionable statutes saving constructions, when an expeditious state remedy is available. None of these circumstances are present in this case.

■ (1) *Avoidance of a federal constitutional question: The Pullman Doctrine.* Under this doctrine federal courts abstain from reaching constitutional questions if a case also contains a question of state law which, in itself, may dispose of the litigation. In the case after which the doctrine was named, Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), plaintiffs, in a federal action, sought an injunction against the enforcement of an order of the State Railroad Commission on the grounds that it denied fourteenth amendment rights and that under Texas law the Commission lacked the authority to issue the challenged order. Although a federal court had the power and authority to decide either or both questions, the Supreme Court held that the district court should not resolve the constitutional question, since the case could be disposed on state law grounds; and furthermore it should not decide the state law issue since such a decision should more properly be made by a state court.

Clearly, this case is not controlled by *Pullman*, as there are no issues of state law which can dispose of the case without need of reaching federal constitutional questions.

■ (2) *Avoiding needless entanglement with complex state regulatory schemes: The Burford Doctrine.* Under this second type of abstention, federal courts have refrained from interfering with complex state regulatory schemes. In Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), the Court held that the district court should have dismissed the complaint in a case involving proration orders in Texas oil fields, on the ground that the issues involved a specialized aspect of a complicated regulatory system of local law, which should be left to the local administrative bodies and courts.

This exception does not apply here because (1) the administrative process involved here "is the antithesis of a 'complex system'." Carothers v. Follette, 314 F.Supp. 1014, 1019 (S.D.N.Y.1970); and (2) the only basis for decision here is that the prisoners' federal constitutional rights have been violated, and state courts having no special expertise in deciding this issue would be required to apply federal constitutional standards; "to abstain, therefore, would merely be to postpone the inevitable." *Carothers, supra.* As the Second Circuit said in declining to abstain in a similar situation,

"We are not dealing here with the administration of a complex state process under which state courts have greater expertise. The actions here are not entangled in state law. Rather the only issues here are whether certain HA procedures pass muster under the due process clause of the Fourteenth Amendment to the federal Constitution. Federal courts are fully competent to consider such issues and are a primary forum for vindicating federal rights." Escalera v. New York City Housing Authority, 425 F.2d 853, 865 (2d Cir. 1970), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970).

*Accord,* Holmes v. New York City Housing Authority, 398 F.2d 262 (2d Cir. 1969); Moreno v. Henckel, 431 F.2d 1299 (5th Cir. 1970); Klim v. Jones, 315 F.Supp. 109, 118 (N.D.Cal.1970) (Levin, J.).

■ (3) *Allowing state courts to save constitutionally questionable statutes.* This type of abstention is clearly not appropriate here. It is reserved for those cases involving vague or overbroad statutes which may be construed so as to avoid their constitutional infirmity. Here, there is no question as to the mean-

ing or scope of the regulations. They must either stand or fall as written, and no interpretation by a state court can preserve them if they are facially unconstitutional. *See* Zwickler v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); McNeese v. Board of Education, 373 U.S. 668, 672, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).[3]

## II. DISCIPLINARY PROCEDURES AT SAN QUENTIN

### A. Procedures Employed

The San Quentin Prison Institution Plan for the Administration of Inmate Discipline (the "Institution Plan") establishes the procedures to be followed in all cases in which inmates are charged with violating prison rules. It provides that when an employee believes an inmate's conduct seriously violates some prison rule, the employee is required to report the facts in writing on Form CDC–115. In some cases, the Form 115 may be supplemented by additional reports, but these are not required. Accused inmates are not permitted to see either the Form 115 or any supplementary reports. In serious cases, prisoners may be moved to isolation cells immediately after the alleged infraction and may be held there for up to seven days before adjudication by a disciplinary committee.

Within a day after placement in isolation, the inmate will be seen by an officer of the "Unit Disciplinary Hearing Court." This officer is supposed to "inform the inmate of the charges placed against him, receive his plea of guilty or not guilty, and * * * carefully weigh the evidence against him." As a result of this adjudication, the officer may himself impose a penalty, but "serious" cases must be referred to the Unit Disciplinary Subcommittee. If such a referral is made, the officer is required to serve the inmate with a CDC Form 263 Notice of Complaint. These notices are required to state simply the charge number and title (*e. g.*, "Inmate Behavior D1201") but need not describe the particular act of misbehavior which may be charged in the Form 115.

Section ID–III–08 of the Institution Plan establishes three categories of disciplinary infractions: "administrative", "disturbance" and "major". These categories are used as a guideline for the Hearing Officer in deciding whether referral to the disciplinary subcommittee should be made, but any "serious" case may be referred regardless of the category in which it falls. The list of infractions does not purport to be complete. The acts enumerated are merely "examples" of what might be punishable.[4]

---

3. The recent United States Supreme Court decisions are inapplicable here. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and the companion cases decided that day involved federal court interference with ongoing state criminal prosecutions and were based on traditional notions of federalism and judicial economy. Nothing in those decisions would lead this court to conclude that federal courts must abstain from deciding civil cases equally cognizable in state courts although not yet instituted. Such an interpretation would reintroduce the exhaustion doctrine into civil rights actions, a procedure certainly not intended by the Supreme Court in the *Younger* decisions.

4. Section ID–III–08 states that "administrative" offenses are those "of a minor nature where no serious threat to Institution security is involved." Examples include "non-serious contraband," "disobey-

ing orders," failure to comply with routine requirements like haircuts, "belligerent attitude or abusive language" and gambling.

"Disturbance" offenses are those "which can or have threatened the good order of the Institution, but are not of major importance." They include "fighting," "threatening employees," "conduct which could lead to violence", "unlawful gatherings," "Immorality," use of intoxicants, deliberate destruction of state property up to $100 and possession of contraband.

"Major" offenses include "all cases involving commission of a felony crime and/or seriously threatening the security and good order of the Institution." Examples are escape, homicide, "felonious assault" on staff or other inmates, possession of "dangerous contraband" such as narcotics or weapons, serious destruction of state property in excess of $100 and participation in a work stoppage or riot.

Each housing unit at San Quentin has a disciplinary committee which meets once a week. It may hear from five to 15 cases per week, but the average is about seven cases. Three officers sit on the committee. There is no rule prohibiting a staff member who was involved in the incident from serving on the committee, although the practice is to avoid this whenever possible. Generally, the unit Hearing Officer is also a member of the committee.

The instructions regarding "adjudication" are identical to those given Hearing Officers. They merely state that the committee should "inform the inmate of the charges against him, receive his plea of guilty or not guilty, and carefully weigh the evidence. Effort will be made to uncover the basic cause(s) underlying the infraction." There are no other procedural directives of any kind in either the Classification Manual or the Director's Rules, or the San Quentin Institution Plan.

If a felony charge is involved, the inmate is advised of his constitutional right to remain silent and to have an attorney present during interrogation; he is specifically advised that anything he says "can and will" be used against him in a court of law. However, if the inmate requests an attorney, he is told he cannot see one until such time as the district attorney interviews him. If he chooses to exercise his right to remain silent lest he say anything which may be used against him in a criminal case, the committee nevertheless proceeds to adjudicate the disciplinary infraction, relying solely on the written reports filed against him.

The committee obtains the Form 115 and any supplementary material in advance of the meeting at which the charges are to be adjudicated. The prisoner is not permitted to see the Form 115 even when he appears before the disciplinary committee; but it is read to him by the committee chairman. In some cases, but not all, there may be supplemental reports on the incident, and the "gist" of these may be summarized for the inmate.

Neither the author of the Form 115 nor the writers of these reports nor any other witnesses are present. The inmates are not entitled to call witnesses or to confront the persons who prepared the reports against them. They are not entitled to the assistance of either a lawyer, a staff member, or another inmate who might help them to present a defense to the charges. Neither the Director's Rules nor the Institution Plan specifies whether inmates may or may not have these procedural rights, but as a matter of invariable practice these rights are denied. In addition to the written reports, the committee's decision may be influenced by oral information "passed on" by other inmates. There is no requirement that the decision be based on evidence adduced at the hearing.

At the hearing, after a brief discussion of the incident, the inmate leaves the room. Most of the time spent by the committee in deliberation is devoted to deciding what disposition to take rather than in ascertaining guilt or innocence. Mr. Apostol knew of no case where the committee's decision had been less than unanimous. He estimated that about ten to 15 percent of all disciplinary charges resulted in acquittal, with a lower percentage in the "major" category (adjudicated by the disciplinary committees) than in the "administrative" category (decided by the Hearing Officer). There is no requirement that the inmate be found guilty beyond a reasonable doubt, or even that the decision of the committee be based on substantial evidence. No rule states what the standard of proof should be.

Section ID–III–06 of the Institution Plan requires one member of the committee to record the "factors that substantiate the findings" of the committee. Mr. Apostol explained that no effort is made to compile a detailed record of the evidence. The notations made on the face of Form 115 comprise the entire record of the proceeding. The only items which must be recorded on the Form 115 are the title of the rule the accused is charged with violating, the

name of the complaining officer, the inmate's plea, the committee's finding, and the disposition ordered.

The Form 115, along with any supplemental report that may have been prepared, constitutes the record which is forwarded for review by the Associate Warden, Custody, for his approval of the committee's action.

Mr. Apostol testified that if the inmate were dissatisfied with the committee's action, he could write to the Associate Warden, Custody (who had already approved the action) requesting further consideration of the case. However, there is nothing in writing that informs inmates of this possibility of "appeal" and Mr. Apostol was unsure whether they are orally told of it. There are no regulations establishing any appeal process.

### B. Consequences of Disciplinary Proceedings

The Director's Rules and the Institution Plan enumerate the punishments which may be imposed by a Unit Hearing Officer and the punishments which may be imposed only by a disciplinary committee. There are no guidelines for deciding which punishment should be imposed for any particular offense. Regardless of which category the violation falls within, the Hearing Officer or the disciplinary committee may order that any or all of the authorized punishments be imposed.

Section ID–II–05 of the Institution Plan authorizes a Unit Hearing Officer acting alone to take one or more of the following actions: dismissal; warning; reprimand; temporary loss of one or more privileges; one or more weekend lock-ups; assignment to special work detail; confinement to quarters not to exceed 30 days; isolation suspended for a six-month period; removal from Honor Unit status; referral to disciplinary committee; and recommendation that no action be taken by the Adult Authority on Parole/Discharge date status.

Section ID–II–06 authorizes the disciplinary committee to take one or more of the following actions in any case it hears: dismissal; referral for further investigation; warning; reprimand; temporary or permanent loss of one or more privileges; confinement in an Isolation and/or Quiet Cell, usually with loss of privileges also assessed; special isolation diet; confinement to cell; removal from assignment; assignment to Segregation status; recommendation to Adult Authority for appropriate action; recommendation to the Director of Corrections regarding forfeiture of earnings; assessment for damages when destruction of state property is involved; and appropriate change in custody. The consequences and impact of most of these is apparent from the description itself. Some of the more serious are described below.

#### (1) Isolation

The period of confinement in an isolation cell usually does not exceed 30 days. The committee has discretion to decide whether the isolation period is to be spent in a regular cell, a "quiet" cell, or a "strip" cell. All three types are found in the isolation wing of the prison. A regular isolation cell is 5 feet by 9 feet, concrete construction, with a barred door; it is furnished with a cot, a sink and a toilet. The light is not controlled by the inmate. The bed has a metal plate instead of a spring. A "quiet" cell has a vestibule and solid door, which may be closed and is furnished with a concrete slab and 1-inch mat in place of the usual cot. A "strip" cell is furnished with an "oriental toilet" (hole in the floor) in place of regulation plumbing.

A prisoner in isolation spends at least 23 hours a day in his cell, being permitted to leave only for a brief period each day, when he may walk up and down alone in the narrow passageway in front of his cell. If the disciplinary committee orders that the prisoner be kept on "cell status" he remains in his cell 24 hours a day, without even the brief respite otherwise permitted for exercise. The exercise period may also be denied if the inmate's conduct while in isolation is considered improper. Pris-

oners in isolation eat their meals alone in their cells. They have only vocal contact with other prisoners who may be in isolation, whom they cannot see except during the exercise period. A special restricted diet may be imposed by the disciplinary committee.

Prisoners are strip searched and all of their personal property is taken from then when they are admitted to isolation. They are not permitted books, magazines, newspapers, or radios, but law books may be ordered from the prison library if needed. No work, study or recreational activity is permitted. The prisoner is forced to spend his day in total idleness. Smoking is not permitted nor is the purchasing of canteen items. Mail is limited to the immediate family, attorney of record, courts and public officials.

### (2) Adjustment Center or Segregation

One of the most serious actions which can be taken by the disciplinary committee is to assign the prisoner to Segregation status, or change his custody to maximum, which means that thereafter he will be housed in the Adjustment Center. Although confinement in "isolation" is ordinarily limited to 30 days, assignment to Segregation or to the Adjustment Center is for an indefinite period of time. Once assigned to the Adjustment Center, a prisoner may remain there for the duration of his sentence.

There is very little difference between "isolation" and the Adjustment Center. Adjustment Center inmates are compelled to spend their days in idleness, confined to their cells 23 hours a day, 7 days a week. None of the ameliorative programs provided for the general prison population are available to them. Because they are not permitted to work, they lose even the meager wages with which they could make minor purchases at the canteen. They cannot enroll in vocational training programs or attend school. They are barred from church services, movies, television and all other forms of recreation and entertainment which might help to relieve the monotony of prison life.

The cells in which Adjustment Center inmates live and eat their meals are of concrete box construction, the same as the isolation cells, approximately 5 feet by 9 feet, with barred doors. There is neither fresh air nor natural light. The ceiling light is not controlled by the inmate. The entire furnishings of the cell consist of a cot, a sink and a toilet. Institution rules prohibit decorating the walls of the cell.

Adjustment Center inmates are permitted to leave the cell for exercise an hour a day but not all are allowed outdoors. Those who are allowed outdoors must submit to a complete strip search, including rectal examination, both before and after. Outdoor exercise takes place in a walled yard connected to the housing unit, not in the general population yard. Adjustment Center inmates are not permitted to use the gymnasium or athletic equipment provided for the general population.

### (3) Referral to Adult Authority and Effect on Parole Consideration

In the federal prison system, as well as that of most states, a practice of granting good-time credits is employed. Under this procedure, defendants are sentenced by the sentencing judge to a fixed period of time. They, of course, may be paroled prior to the date originally set by the judge. In addition, prisoners "earn" good-time credits for good behavior which goes to reduce the actual maximum term of imprisonment.

In jurisdictions that maintain this system, disciplinary committees may forfeit prisoners' good-time credits as punishment for violation of prison rules. In these jurisdictions, elaborate procedural safeguards must be followed before a prisoner's good-time credits may be forfeited.[5]

---

5. See Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970); Carothers v. Follette, 314 F.Supp. 1014 (S.D.N.Y.1970); Kritsky v. McGinnis, 313 F.Supp. 1247

While California used to be among the states with such a scheme, it is no longer. In California, under the Indeterminate Sentence Law, Cal.Pen.Code, §§ 1168, 3020 and 5077, criminal offenses carry statutorily prescribed punishments with a minimum and maximum term. Sentencing judges sentence convicted defendants to "the term prescribed by law" which is measured by these statutory minimums and maximums. Each year, a prisoner's case comes before the Adult Authority, at which time the Adult Authority may do one of three things. It may "continue" consideration until the following year, it may set a maximum sentence the prisoner will have to serve, or it may set a release date (parole) once a maximum has been set. In other words, the actual time an individual inmate must serve is decided by the Adult Authority at its complete discretion.

Needless to say, an inmate's prison behavior is a key factor in the Adult Authority's decision making process. Currently, Resolution No. 216 (6/5/64) of the Adult Authority requires that a report of all disciplinary actions be presented to the Adult Authority at the time it considers the fixing of sentence and parole date. While a disciplinary proceeding cannot result in loss of good-time credits—since there are no good-time credits in California due to the internal inconsistency of earning credits against an indeterminate sentence—it is obvious that disciplinary action taken against a prisoner and reported to the Adult Authority can and does have an adverse effect on the length of his sentence, parallel to the loss of good-time credits in other jurisdictions.

If the disciplinary committee finds an inmate guilty of a disciplinary offense occurring after the Adult Authority has set his sentence and parole date, the offense must be reported to the Adult Authority for immediate action. A single disciplinary offense is sufficient cause for the Adult Authority to rescind the parole release order and reset the prisoner's sentence at the statutory maximum; and the disciplinary committee is authorized to recommend that the Adult Authority rescind the parole date.

(4) *Assessment of Damages or Recommendation Regarding Forfeiture of Earnings*

If the violation consists of destruction of state property, the disciplinary committee may levy upon earnings—both accumulated and future—for payment of the repair costs. The amount involved would vary significantly depending on the property allegedly destroyed.

In any other type of offense adjudicated by the disciplinary committee, it can recommend to the Director of the Department of Corrections that any wages be forfeited as in the nature of a fine. It is then up to the Director to determine if such a forfeiture is appropriate, and if so, how much should be forfeited.

## III. MIRANDA IN THE PRISON

One important aspect of the procedures outlined above can be disposed of on traditional notions of due process and the protections provided by the fifth and sixth amendments, without reaching the more difficult problem of due process requirements in disciplinary hearings generally.

As described above, the procedures employed when a prisoner is charged with an offense which may be referred to the district attorney for prosecution as a felony suffers from serious constitutional infirmities—more serious even than those delineated by the Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

This procedure provides that in such instances, when the prisoner is brought

(N.D.N.Y.1970) ; Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969). Indeed, before California adopted the indeterminate sentence procedure, it had a good-time credit scheme ; and prisoners facing the loss of these credits as a result of disciplinary proceedings were entitled to present evidence and call witnesses on their own behalf. Cal.Pen.Code, § 2924.

before the disciplinary committee he is told that his case may be referred to the district attorney, and is then given the standard *Miranda* warnings, including his various rights with respect to remaining silent, his rights to counsel, and the fact that anything he says at the *disciplinary hearing* may and will be used against him at his subsequent trial. Should he then ask for the assistance of counsel, either retained or appointed, he is told that this right attaches *only* when he is questioned by the district attorney. Should he choose to remain silent, pursuant to his rights as delineated in the warning and in furtherance of those rights, the disciplinary committee nonetheless proceeds to adjudicate his case. Should he desire to make a statement in his own behalf, for example, a statement that he did do the act with which he is charged but the circumstances were such as to mitigate his disciplinary punishment, he does so at the peril of having his "confession" admitted as evidence in a state prosecution.

In *Miranda,* the Supreme Court held that a custodial interrogation by police officers is inherently coercive and thus an accused must be fully apprised of his rights prior to any such questioning. Furthermore, if, at any time during such questioning he wished to exercise any of his rights, the questioning must stop and those rights must be afforded. In a *Miranda* situation, the only consequences of the accused's exercising his right to remain silent are that the police stop asking him questions.

In a situation involving a prisoner before the disciplinary committee, indeed in the very case of named plaintiff Cluchette, the coercive nature of the questioning, while perhaps more subtle

than that in *Miranda,* is also more devastating. The prisoner, warned that anything he says may be used against him in a criminal prosecution, is put to the choice between remaining silent and sacrificing his right to defend himself before the committee, or speaking to the committee and risking incriminating himself in a future prosecution. The trap is unavoidable. Not only does he risk multiple punishment for the same act—a practice not challenged here but one which may, in light of recent Supreme Court decision, pose some constitutional questions—he definitionally prejudices himself in one proceeding by acting in his best interests in the other.

■ For this reason, it is imperative that a prisoner be afforded counsel, not a counsel-substitute, when he is charged with a prison rule violation which may be punishable by state authorities. In such a position, the prisoner is put in a serious dilemma not faced by an accused in a normal *Miranda* situation, and counsel is required, for reasons more compelling than those present in *Miranda,* to protect his constitutional rights.[6]

■ Furthermore, irrespective of anything expressed later in this opinion, the situation described requires the imposition of additional safeguards. As indicated above, accused prisoners have no right to cross-examine persons who submit the Form 115 or any supplemental reports reciting accusatory facts. Likewise, they have no right to call witnesses in their own behalf or even submit written reports from witnesses in their own behalf.

Whatever the decision ultimately reached by this court or any appellate court on a prisoner's right to affirmatively defend himself in normal disci-

6. Nothing in the recent Supreme Court decision of McGautha v. California, 401 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), alters this position. As the Court said in *McGautha*:

"Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token

always forbid requiring him to choose." *McGautha, supra* at 213, 91 S.Ct. at 1470.

What today's order requires is not that prisoners be permitted to circumvent the choice between two conflicting constitutional rights, but only that they be provided with counsel to help them make the choice.

plinary hearings, it is clear that when he is charged with an offense for which state criminal proceedings may be instituted, and is warned that he has a right to remain silent and that anything he says may and will be used against him in such a proceeding, a prisoner cannot be compelled to sacrifice his only defense in order to exercise his equally compelling constitutional right to remain silent.

In any proceeding in which an accused party exercises his right to remain silent, he naturally sacrifices one means of defense. In the normal criminal prosecution, or civil-criminal combination, we are not troubled by this sacrifice, as the defendant is protected by many procedural safeguards, and retains the alternative of defending himself by means of calling and cross-examining witnesses. In a disciplinary proceeding, prisoners are not protected by these same procedural safeguards, i. e., a presumption of innocence with the burden of proof beyond a reasonable doubt on the state. Furthermore, should the charged prisoner choose to exercise his right to remain silent, he is stripped of any possible means of defense. The choice thus put to him of sacrificing one fundamental right as a price for exercising another is repugnant to our notions of due process. United States v. Jackson, 390 U.S. 570, 581–585, 88 S.Ct. 1209, 20 L.Ed. 2d 138 (1968); Simmons v. United States, 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).[7] Therefore, irrespective of or in addition to any arguments regarding a prisoner's right to call witnesses in his own behalf and cross-examine witnesses against him in disciplinary hearings generally, when the offense charged may be referred to the district attorney for prosecution in state courts, prisoners must be afforded these rights so as to maintain the integrity of their fifth amendment right to remain silent.

## IV. DUE PROCESS GENERALLY

■ Whatever the state of the law regarding procedural due process prior to 1969, the Supreme Court's decision that year in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969), delineated its perimeters clearly for future proceedings. Holding that before welfare benefits may be terminated, the agency must conduct an adversary proceeding with all the elements of due process incident thereto, the Court dispelled any lingering remnants of the theory that procedural due process was only required when some "vested right" was being impaired. To that end, the Court said:

"Such benefits are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right."' Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, [89 S.Ct. 1322, 1327, 22 L.Ed.2d 600] (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, Sherbert v. Verner, 374 U.S. 398, [83 S.Ct. 1790, 10 L.Ed.2d 965] (1963); or to denial of a tax exemption, Speiser v. Randall, 357 U.S. 513, [78 S.Ct. 1332, 2 L.Ed.

---

7. Again, *McGautha* in no way vitiates this conclusion. A major factor in the decision not to compel a separate penalty trial in capital cases, despite the "tension" between petitioner's right to remain silent on the issue of guilt and the right to present mitigating testimony to the jury on the issue of punishment, was the fact that a defendant's counsel, through oral argument, could still present this data to the jury. Here, absent any right to es-

tablish a defense or test the authority's case, a prisoner who exercises his right to remain silent forfeits *any* possible defense to the charges. *See also* n. 20, 401 U.S. at 217, 91 S.Ct. at 1472 of *McGautha* for a suggestion that the absence of the procedural rights required by this opinion and order might have had a very substantial effect on the result reached in *McGautha.*

2d 1460] (1958); or to discharge from public employment, Slochower v. Board of Higher Education, 350 U.S. 551, [76 S.Ct. 637, 100 L.Ed. 692] (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, [71 S.Ct. 624, 95 L.Ed. 817] (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in Cafeteria & Restaurant Workers Union, etc., v. McElroy, 367 U.S. 886, 895, [81 S.Ct. 1743, 1748–1749, 6 L.Ed.2d 1230] (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also Hannah v. Larche, 363 U.S. 420, 440, 442, [80 S.Ct. 1502, 1513–1514, 4 L.Ed.2d 1307] (1960)." Goldberg v. Kelly, supra at 262–263, 90 S.Ct. at 1017–1018.

■ Measured against this reasoning, the argument that a state prisoner is committed to the custody of the Department of Corrections and as such may be confined in any manner chosen by the Director, subject only to statutory guidelines and the proscriptions of the "cruel and unusual punishment" clause of the eighth amendment, is unpersuasive. It is based on the theory that "custody is custody," regardless of how it is carried out, and that a prisoner suffers no real loss or gain when the nature of his custody is changed. This court has already implicitly rejected this theory in Ellhamer v. Wilson, 312 F.Supp. 1245 (N.D. Cal.1969); Wilburn v. Nelson, 323 F.

Supp. 585 (N.D.Cal.1970); Mays v. Nelson, 323 F.Supp. 587 (N.D.Cal.1970). While prisoners may have no vested right to a certain type of confinement or certain privileges, it is unrealistic to argue that the withdrawal of those privileges they do have, or the substitution of more burdensome conditions of confinement would not, under their "set of circumstances," constitute a "grievous loss." As the Fifth Circuit Court of Appeals has stated:

> "[A]ny further restraints or deprivations in excess of that inherent in the sentence and in the normal structure of prison life should be subject to judicial scrutiny." Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968).

The very regulations under attack in this case implicitly recognize that these changes in status are significant losses of already limited comforts, and not simply "administrative changes," since they are held out as punishment for violation of prison rules.

The very real and substantial danger of an increased term of imprisonment by reason of a referral to the Adult Authority is a grievous loss, as is confinement in some form of maximum security accompanied by the loss of privileges or the loss of income, past or future. While some of these punishments may, on the surface, appear to be mere "slaps on the wrist", for a prisoner who will, by this punishment, suffer the loss of those privileges intended to relieve him from the otherwise routine existence of prison life, money saved to purchase personal items, or the possibility of an accelerated release date, such acts are highly punitive. Outside the prison gates, proceedings resulting in far less punitive consequences must be attendant with elements of due process.[8]

Thus, as a general proposition, there are at least some instances when the severity of the potential punishment com-

---

8. *See, e. g.*, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971) (placing name on list of chronic drunks); Jones v. Robinson, 440

F.2d 249 (D.C.Cir. 1971) (transferring patient accused of crime to maximum security section of hospital).

pels the imposition of some elements of procedural due process on prison disciplinary hearings. When such procedures are required, and the extent to which they are required are explored below.

 Procedural due process must obtain whenever the individual is subject to "grievous loss" at the hands of the state or its instrumentalities. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). This cannot be judged after the fact, in light of the punishment actually ordered, but must be based on the potential punishment that the disciplinary committee can require. Cf., Duncan v. Louisiana, 391 U.S. 145, 159–160, 88 S.Ct. 1444, 20 L.Ed. 2d 491 (1968). The rules presently permit the disciplinary committee or a single hearing officer to impose the full range of potential punishments for violation of any prison rule.[9] Thus, since some of those punishments are serious enough, as defined by *Goldberg*, to require the imposition of procedural due process, these requirements must obtain in all disciplinary committee or hearing officer proceedings. This is not to say that prison officials could not develop specific criteria for imposing various punishments; for example, they might choose to establish a schedule of potential punishments for every offense, so as to know in advance whether or not the hearing may result in punishment which will require these due process safeguards.[10]

With this thought in mind, and without attempting to be either exhaustive or binding, the following situations are offered as instances in which the loss to the prisoner is sufficiently serious so as to require the imposition of procedural due process as delineated below:

(a) Violations punishable by indefinite confinement in the adjustment center or segregation;

(b) Violations, the punishment for which may tend to increase a prisoner's sentence; *i. e.*, those which must be referred to the Adult Authority;

(c) Violations which may result in a fine or forfeiture;

(d) Violations which may result in any type of isolation confinement longer than ten days;

(e) Violations which may be referred to the district attorney for criminal prosecution.

Should respondent prison officials choose to adopt this or some similar schedule rather than afford all prisoners charged with any violation the due process safeguards set out below, this court would of course expect to review the schedule prior to its promulgation and for this purpose retains jurisdiction over this aspect of the proceedings.

## V. REQUIREMENTS OF RUDIMENTARY PROCEDURAL DUE PROCESS

" '[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' Cafeteria & Restaurant Workers Union, etc. v. McElroy, 367 U.S. 886, 895, [81 S.Ct. 1743, 6 L.Ed.2d 1230] (1961) * * *. We wish to add that we, no less than the dissenters, recognize the importance of not imposing upon the States or the Federal Government in this developing field of law any procedural requirements beyond those demanded by rudimentary due process." Goldberg v. Kelly, 397 U.S. 254, 263, 267, 90 S.Ct. 1011, 1018, 1020, 25 L.Ed.2d 287 (1969).[11]

---

9. As pointed out above, a hearing officer cannot impose all the penalties that the disciplinary committee can. However, he can impose punishment severe enough to warrant the requirements of procedural due process.

10. As a matter of social policy and not constitutional law, this might be a more effective way to deter undesirable behavior.

11. It is around this language that this court must, with all due respect, take issue with the Second Circuit, and its

With this introduction, the Supreme Court proceeded to clearly establish what is demanded by rudimentary due process.

## A. Notice

In *Goldberg*, the Court said that rudimentary principles of due process "require that a recipient have *timely* and adequate notice *detailing the reasons* for a proposed termination * * *." *Goldberg, supra* at 267–268, 90 S.Ct. at 1020 (emphasis supplied). Specifically, it approved the 7 day notice requirement and the substance of the notice which "inform(s) a recipient of the *precise questions* raised about his continued eligibility." *Goldberg, supra* at 268, 90 S.Ct. at 1020 (emphasis added).

 In the present context, both the form and procedure of the notice given are constitutionally infirm. Those cases currently heard and decided by the hearing officer have no real provision for notice. The procedure simply requires that several days after the alleged offense the hearing officer shall approach the prisoner, advise him of the charge, take his statement and plea and adjudicate the case. While this may be adequate in some cases, it is clearly inadequate when serious punishment may result.[12]

 If the hearing officer concludes that the case is a proper one for the disciplinary committee to hear, he subsequently "serves" the prisoner with a Form 263 Notice of Complaint. This notice is constitutionally defective in two ways. First, since all that is required to state is a rule number and name, it does not adequately apprise the prisoner of what he is accused of having done. Second, hearings are held every week at which time all cases arising during the week are heard. Thus, the maximum amount of time a prisoner would have to prepare his case is 7 days; the minimum is overnight.

 While *Goldberg* did not establish constitutional minimums, it seems clear that to satisfy constitutional requirements, notice of at least 7 days of any charge requiring procedural due process, whether heard by a hearing officer or disciplinary committee, is the minimum acceptable period. Furthermore, to constitute meaningful notice, at least a brief statement of the facts upon which the charge is based, as well as the name and number of the rule allegedly broken must be included. Absent these, an accused prisoner is without sufficient time or information to prepare any defense on the merits.[13]

## B. Witnesses

"In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. E. g., I.C.C. v. Louisville & N.R. Co., 227 U.S. 88, 93–94, [33 S.Ct. 185, 57 L.Ed. 431] (1913); Willner v. Committee on Character and Fitness,

decision in Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971) (en banc). In *Sostre*, the Court of Appeals recognized that disciplinary punishment constituted a "grievous loss" within the meaning of *Goldberg*. They framed their inquiry, however, into an analysis of what "process" is "due," and concluded that the requirements set out by the district court, which were similar to those set out here, were more than that required by the due process clause. In light of the quoted portion of *Goldberg*, in which the Supreme Court held that the requirements it was about to set out (requirements this court is now adopting as applicable to disciplinary hearings) did not extend "beyond those demanded by rudimentary due process," it is difficult to under-

stand the conclusion that something less is constitutionally adequate.

12. At present, hearing officers may impose a broad range of punishments, from mere warning to 30 days cell status or recommendation that the Adult Authority take no action on fixing a parole date.

13. Nothing in this or any other portion of this opinion and order is intended to suggest that prison officials cannot immediately place in isolation those charged with violating prison rules or anyone whose continued "freedom" poses an immediate threat of violence or disruption, provided of course that the officials thereafter proceed expeditiously to hold an appropriate hearing.

373 U.S. 96, 103–104, [83 S.Ct. 1175, 10 L.Ed.2d 224] (1963)." Goldberg v. Kelly, *supra* at 269, 90 S.Ct. at 1021.[14]

■ The San Quentin Prison Rules provide that all "testimony" take the form of written reports by witnesses. Not only are the authors of these reports unavailable for personal examination, the reports themselves are not shown to or even read to the accused. This clearly misses, by a wide mark, the fundamental principles of due process required in *Goldberg*. Prisoners must be given the right to call witnesses in their own behalf and cross-examine witnesses against them.[15]

## C. Counsel

■ "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932), quoted in *Goldberg, supra,* 397 U.S. at 270, 90 S.Ct. at 1022. Under the present set of rules, prisoners are not entitled to the assistance of retained or appointed counsel or counsel-substitute. Rudimentary principles of due process require the presence of counsel when the rights of an individual are seriously threatened by governmental action. *Cf.* Gideon v. Wainwright, 372 U.S. 335, 83

S.Ct. 792, 9 L.Ed.2d 799 (1963); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1969). Elements of equal protection demand that when the prisoner is indigent, the state must provide him with counsel. *Cf.,* Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Recently, the Supreme Court has held that in some instances counsel-substitute will be acceptable. Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). While only counsel is acceptable in the case of an offense which will be referred to the district attorney, in all other cases prison officials should not be precluded from providing an adequate counsel-substitute.

## D. Decision Based on the Evidence

"[T]he decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. Ohio Bell Tel. Co. v. P.U.C., 301 U.S. 292, [57 S.Ct. 724, 81 L.Ed. 1093] (1937); United States v. Abilene & S.R. Co., 265 U.S. 274, 288–289, [44 S.Ct. 565, 68 L.Ed. 1016] (1924). To demonstrate compliance with this elementary requirement, the decisionmaker should state the reasons for his determination

14. The Court went on to quote from Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959):

> "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the require-

> ments of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment * * *. This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, * * * but also in all types of cases where administrative * * * actions were under scrutiny."

15. The recent case of Richardson v. Perales, 401 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), in no way diminishes the thrust of *Goldberg.* In *Perales,* the Court distinguished *Goldberg* on the ground that, among other differences, the Social Security Act allowed claimants to subpoena doctors submitting adverse reports for the purposes of eliciting direct testimony subject to cross-examination. Neither the procedures considered in *Goldberg,* nor those involved herein provide for such testimony.

and indicate the evidence he relied on, cf. Wichita R. & Light Co. v. P.U.C., 260 U.S. 48, 57–59, [43 S.Ct. 51, 54–55, 67 L.Ed. 124] (1922), though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." Goldberg v. Kelly, *supra* 397 U.S. at 271, 90 S.Ct. at 1022.

Rules of evidence, as a general proposition, do not rise to constitutional levels. Thus, it would be inappropriate for this court to establish a "weight of the evidence" rule more stringent than the due process clause requires. When reviewing a disciplinary committee decision in a suit brought under 42 U.S.C. § 1983, district courts have traditional standards to review decisions for arbitrariness. It is hoped, although not constitutionally compelled, that disciplinary committees will apply a "weight of the evidence" rule somewhat more exacting.

### E. Decision by an Unbiased Fact-finder

"[O]f course, an impartial decision maker is essential. *Cf.* In re Murchison, 349 U.S. 133, [75 S.Ct. 623, 99 L.Ed. 942] (1955); Wong Yang Sung v. McGrath, 339 U.S. 33, 45–46, [70 S.Ct. 445, 94 L.Ed. 616] (1950). We agree with the District Court that prior involvement in some aspects of a case will not necessarily bar a welfare official from acting as a decision maker. He should not, however, have participated in making the determination under review." Goldberg v. Kelly, *supra* at 271, 90 S.Ct. at 1022.

■■■ Under the present system, there is no prescription against the participation in the decision by one involved in the incident, although such a practice is discouraged. It is difficult in the abstract to establish a fixed rule regarding participation by involved parties, particularly in light of the above-quoted language. But such a rule must be fixed. It follows that if participation by involved parties is, in some instances acceptable, in others it is not. To preclude a multitude of individual challenges, a uniform policy consistent with due process requirements must be established and applied in every case. Such a policy must be framed so as to preclude, in all cases, the participation in any aspect of the decision of the disciplinary committee of any one charged with a subsequent review of that decision, or anyone with personal knowledge of any material fact relevant to the decision. Only through such a policy can complete impartiality be insured in all cases.

### F. Right to Appeal

The status of a right to appeal a decision of the disciplinary committee is unclear. It appears that while such a right exists, its existence is not uniformly known, and only irregular, individual efforts to make it known occur.

■■■ There is no constitutionally protected right to appeal the decision of a fact-finding tribunal. However, if statutes or regulations provide for an appeal of right, the equal protection clause requires that all those affected be treated alike. *See* Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Thus, officials cannot rely on word of mouth to notify prisoners of their right to appeal or the procedures for such an appeal. Nor can they notify some prisoners at the conclusion of disciplinary proceedings and fail to notify others. The equal protection clause contemplates uniform treatment of all prisoners.

Now, therefore, it is ordered, adjudged and decreed that:

1. The above memorandum opinion constitutes the court's findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52(a);

2. Plaintiffs are hereby granted a declaratory judgment with respect to their first cause of action insofar as this opinion and order declare that the disciplinary procedures employed at San Quentin Prison violate the due process and equal protection clauses of the 14th amendment by failing to provide for adequate notice of charges, the calling of favorable witnesses and cross-examination of accusing witnesses, counsel or counsel-substitute, a decision by a fact-finder uninvolved with the alleged inci-

dent, a written finding of facts, or uniform notice of any right to appeal the decision, when such a disciplinary hearing may result in grievous loss to the prisoner; and that certain disciplinary punishment, including but not necessarily limited to (a) indefinite confinement in the adjustment center or segregation; (b) possible increase in a prisoner's sentence by reason of referral of the disciplinary action to the Adult Authority; (c) a fine or forfeiture of accumulated or future earnings; (d) isolation confinement longer than 10 days; or (e) referral to the district attorney for criminal prosecution, constitute such a grievous loss to the prisoner;

3. Defendants are hereby preliminarily and permanently enjoined from conducting any further disciplinary hearings at San Quentin Prison so long as the procedures employed are constitutionally infirm as set out above;

4. The decisions of the disciplinary committee in the disciplinary hearings of the named plaintiffs, Clutchette and Jackson, are set aside, and said plaintiffs shall be restored to the status of confinement they enjoyed prior to the institution of such proceedings, and such decisions shall be expunged from all their records, and shall not be referred to the Adult Authority;

5. Defendants are ordered to submit a plan for the conduct of disciplinary committee hearings, consistent with the opinion this day entered, to this court within 100 days for approval by this court; 10 days prior to this date of submission, defendants shall serve a copy of said plan to attorneys for plaintiffs;

6. Execution of this order is stayed, insofar as it enjoins any further disciplinary hearings and sets aside the decisions in any disciplinary hearings already held, for 30 days to allow the Attorney General of the State of California to file a notice of appeal, should he so desire. In the event that such a notice is filed, the above-described portion of this order is stayed until further order of this court.