George **SHIMABUKU** et al., Plaintiffs,

v.

Samuel J. **BRITTON**, Warden, United States Penitentiary at Leavenworth, Kansas, et al., Defendants.

No. L–2205.

United States District Court,
D. Kansas.

Feb. 26, 1973.

Robert Claus, Wyandotte County Legal Aid Society, Kansas City, Kan., and Allen M. Ressler, and Ronald L. Roseman, Legal Aid and Defender Society, Greater Kansas City, Kansas City, Mo., for plaintiffs.

Robert J. Roth, U. S. Atty., Wichita, Kan., and Bruce E. Miller, Asst. U. S. Atty., Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

STANLEY, Senior Judge.

This is a class action for declaratory and injunctive relief brought by the plaintiffs individually and on behalf of all past, present and future inmates of the United States Penitentiary, Leaven-

worth, Kansas, who have been, are now, or will be, "subjected to confinement in the segregation unit at the penitentiary in connection with any of the prohibited acts in a federal penal or correctional institution *which act also violates federal statutes.*" (Emphasis supplied).

Jurisdiction of this court, invoked under the provisions of 28 U.S.C.A. § 1331, is claimed on the ground that the matter in controversy exceeds $10,000 and arises under the Fifth Amendment to the Constitution of the United States. The individual plaintiffs on July 12, 1972 filed an affidavit meeting the technical requirements of 28 U.S.C.A. § 1915 and were permitted to proceed in forma pauperis. The poverty affidavit, signed and sworn to by each plaintiff, includes the statement that "they are without assets, and have no income."

■ The defendants would have the court dismiss this case because the allegation of poverty is untrue. In answers to interrogatories the plaintiffs Shimabuku, Brown, Graven and James reported that on July 12, 1972 they had money to their credit in the accounts of the penitentiary in the amounts, respectively, of $315.31, $45.00, $51.27 and $61.41. The court finds that as to the plaintiffs Shimabuku, Brown, Graven and James, the allegation of poverty is untrue and, pursuant to 28 U.S.C.A. § 1915(d), this action will be dismissed as to those plaintiffs.

■ The jurisdiction of this court is challenged on the ground that the matter in controversy does not exceed $10,000, as required by 28 U.S.C.A. § 1331(a). The defendants' point is well taken. Jurisdiction under § 1331 cannot be founded on a right secured by the Constitution unless that right "has a known and certain value, which can be proved and calculated, in the ordinary mode of a business transaction." Barry v. Mercein, 46 U.S. 103, 120, 12 L.Ed. 70; Goldsmith v. Sutherland, 426 F.2d 1395 (6th Cir. 1970).

■ The defendants are federal, not state, officers, and the plaintiffs cannot have recourse to 42 U.S.C.A. § 1983 and 28 U.S.C.A. § 1343 as did the plaintiffs in Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971), the case upon which our plaintiffs principally rely. Nor are they helped by their prayer for declaratory relief. Title 28 U.S.C.A. § 2201 does not grant jurisdiction to_ the federal courts. It merely provides an additional remedy in cases where jurisdiction otherwise exists. Wright, Federal Courts 2d ed. 449; and see Duggins v. Hunt, 323 F.2d 746 (10th Cir. 1963).

■ However, the plaintiffs are inmates of a federal penitentiary and the district courts are frequently admonished that prisoners' complaints should receive preferred attention and that their claims of violation of their constitutional rights must be judicially determined. In the light of the prevailing legal philosophy the complaint of Coleman, Pineda and Williams will be treated as an application for habeas corpus relief and jurisdiction will be assumed.

The plaintiffs agree that the only issue involved in this case is the inadequacy of procedural safeguards at prison disciplinary hearings "when the charge involves an alleged act that is prohibited by federal statute and can result in a federal criminal prosecution." They argue that if an accused prisoner exercises his Fifth Amendment right to remain silent at the disciplinary hearing because of the risk of self-incrimination in a subsequent criminal prosecution, he is rendered defenseless to the charge of violation of prison regulations.

The facts have been stipulated and the case submitted to the court, the stipulation providing that the court may consider all pleadings (including attached exhibits), all reports and information on file pertaining to named plaintiffs, and all discovery admissions and answers to interrogatories on file. The stipulation is incorporated by reference as the court's findings of fact.

■ It is true that the plaintiffs, as prisoners, have not lost all of their

rights under the Federal Constitution. It is also true that "(l)awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356.

Until recently the courts have felt that a formal hearing was not constitutionally required at a prison administrative proceeding, e. g., Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970). The decision of the Supreme Court in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 has cast some doubt on the validity of such precedents. In Goldberg it was held that a welfare recipient is entitled to procedural due process at a hearing which might result in "grievous loss." Some courts, believing that disciplinary action results in "grievous loss" to charged prisoners, have applied Goldberg by analogy to prison administrative hearings. These courts have held that prisoners accused of violation of institutional regulations must be accorded procedural due process at disciplinary hearings. Sostre v. Rockefeller, 312 F.Supp. 863 (S.D.N.Y.1970); Clutchette v. Procunier, supra. On appeal from the decision of the district court in Sostre v. Rockefeller, the Second Circuit disagreed with the district court's conclusion that a prisoner must be accorded in a disciplinary hearing all of the due process safeguards set forth in Goldberg. The Court of Appeals held that due process requirements were met if the prisoner was confronted with the accusation, informed of the evidence against him, and afforded a reasonable opportunity to explain his actions. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971).

In Clutchette the court was concerned with the dilemma confronting an accused prisoner where the act alleged as a violation of regulations also constituted an offense which might be prosecuted in a criminal proceeding. Judge Zirpoli felt that the inmate in such case should not be compelled "to sacrifice his only defense in order to exercise his equally compelling constitutional right to remain silent." (328 F.Supp. p. 779). It was held that it was a denial of due process to require a charged prisoner to give up one fundamental right as a price for exercising another.

■ Confronted with the same problem, the United States District Court for the Middle District of Florida ruled that an inmate is entitled to "use immunity" in a subsequent prosecution to the extent that his statements in the disciplinary proceeding may not be used affirmatively against him. Sands v. Wainwright, 357 F.Supp. 1062 (M.D.Fla., 1973). See Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562; Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247; Melson v. Sard, 131 U.S.App.D.C. 102, 402 F.2d 653 (1968). As is said by Judge Scott in his opinion, "(t)he result of this rule accommodates the interests of the parties as well as justice. The inmate is free to be heard in his defense in the disciplinary proceedings while the state is free to promote prison discipline and to protect its interest in the prosecution of crime." This court finds that each individual plaintiff was confronted with the accusation against him, informed of the evidence against him, and afforded a reasonable opportunity to explain his actions; that the same procedure is followed by the defendants in all cases in which members of the class are charged with violation of regulations by reason of alleged acts which also constitute offenses subject to criminal prosecution. The court concludes that the plaintiffs and all members of the class which they purport to represent have been and are accorded hearings meeting the due process requirements of the Federal Constitution, and that the plaintiffs are entitled to no relief.

## STIPULATION OF FACT

Counsel for plaintiffs and defendants agree that the following are uncontroverted facts:

1. That all named plaintiffs are presently confined at the United States Penitentiary at Leavenworth, Kansas.

2. That on or about June 14, 1972, Elloyd Morrow was found in the vegetable preparation room, and that he was subsequently pronounced dead as the result of numerous knife wounds.

3. That between June 14 and approximately June 22, 1972, each of the named plaintiffs was removed from the general prison population and confined in one of the penitentiary's control units; that the United States Penitentiary at Leavenworth, Kansas, contains two (2) control units, one in Building 63, which houses Phase I and Phase II of the control unit, and one in C cell block, which contains Phase III of the control unit.

4. That on or about June 22, 1972, reports were filed by H. E. Bailey, an employee of the Federal Penitentiary at Leavenworth, Kansas, stating that the "charge" against each of the named plaintiffs was as follows:

(a) George Shimabuku with "investigation of possible involvement in inmate homicide."

(b) Joseph H. Brown with "investigation of possible involvement in inmate homicide."

(c) Jerry Ray James with "investigation of possible involvement in inmate homicide."

(d) Ricardo Pineda with "investigation of possible involvement in inmate homicide."

(e) Tommy Joe Graven, a/k/a Tony Graven, with "investigation of possible involvement in inmate homicide."

(f) Earl Lee Williams with "suspicion of involvement in inmate homicide and unaccountable absence from institutional assignment."

5. That on or about June 16, 1972, plaintiff Alton B. Coleman was charged with attempting to bribe another inmate to confess to the murder of Morrow, and that on or about June 22, 1972, a report was filed by H. E. Bailey, an employee of the Federal Institution at Leavenworth, Kansas, stating that the "charge"

against Alton B. Coleman was "suspicion of involvement in inmate homicide."

6. That prior to issuing the reports on June 22, 1972, an employee of the Federal Penitentiary had indicated that he had been informed by unofficial sources that:

(a) George Shimabuku was one of the inmates who had actively participated in the murder of Elloyd Morrow.

(b) Joseph H. Brown was one of the inmates who had actively participated in the murder of Elloyd Morrow.

(c) Jerry Ray James was one of the inmates who had actively participated in the murder of Elloyd Morrow.

(d) Tommy J. Graven, a/k/a Tony Graven, was one of the inmates who had actively participated in the murder of Elloyd Morrow.

7. That prior to issuing the report on June 22, 1972, on Ricardo Pineda, employees of the United States Penitentiary at Leavenworth, Kansas, had indicated that they were informed by the F. B.I. that an inmate admitted serving as lookout during the homicide; that he said plaintiff Pineda was near the incident area during the time the killing took place.

8. That prior to issuing the report on plaintiff Earl Lee Williams, on June 22, 1972, the employees of the United States Penitentiary at Leavenworth, Kansas, had indicated that they had information from unofficial sources that plaintiff Williams was missing from his assignment area for about two hours during the time period in which the killing took place; that he had told an unidentified informer that he planned to kill another inmate, and that he, plaintiff Williams, had been seen by the same informant, who had stood lookout during the homicide, entering the area where the victim was found and that Williams came out twenty minutes later alone.

9. That prior to issuing the report on plaintiff Coleman on June 22, 1972,

the employees of the United States Penitentiary at Leavenworth, Kansas, had indicated that they had been informed by unofficial sources that plaintiff Coleman had offered an unidentified person 20 cartons of cigarettes to confess to the murder of Elloyd Morrow to "get his friends off the hook."

10. That on or about June 22, 1972, Lt. J. A. Junk, control unit supervisor, did question each of the named plaintiffs concerning the homicide of Elloyd Morrow and their whereabouts during the time period that Morrow was killed.

11. That at no time did Lt. J. A. Junk inform named plaintiffs:

(a) That they had a right to remain silent.

(b) That any statement that they made to him would be summarized in a report, and that these statements could later be used against them in a criminal prosecution.

(c) That they had a right to have an attorney present while being questioned by agents and employees of the United States Government concerning their alleged involvement in the homicide of inmate Elloyd Morrow.

(d) That even if they answered some questions, they could, nevertheless, at any time refrain from answering further inquiries until they had consulted with an attorney and thereafter consented to be questioned.

12. That agents and employees of the United States Penitentiary at Leavenworth, Kansas, did order each of the named plaintiffs herein to be confined to either Building 63 control unit or the C cell block control unit.

13. That all reports on each of the named plaintiffs were referred to the institution adjustment committee for action.

14. That on or about June 16, 1972, the adjustment committee did conduct a hearing for plaintiff Alton B. Coleman on a charge of bribing an inmate to confess to the murder of Elloyd Morrow.

15. That on or about June 26, 1972, the adjustment committee did conduct hearings for plaintiffs Shimabuku, Graven and James, Pineda, Williams and Brown, and did conduct a second hearing for plaintiff Coleman on the "charge" enumerated in each of their individual reports.

16. That on or about June 26, 1972, the adjustment committee, at the individual hearings, read each plaintiffs' individual report which alleged active participation in the homicide of Elloyd Morrow, and then did question:

(a) George Shimabuku concerning his possible involvement in the inmate homicide and he was asked to furnish an alibi for the time of the killing.

(b) Joseph Harry Brown concerning his possible involvement in the inmate homicide. He was further questioned concerning letters he mailed to the Penal Digest International, which gave details of the murder. That he was further questioned about any relationship he had with the victim while both were confined at the United States Penitentiary at Atlanta, Georgia. He was also asked to furnish an alibi for the time of the killing.

(c) Jerry Ray James concerning his possible involvement in the inmate homicide and that he was further asked to supply an alibi for the time that the homicide occurred.

(d) Tommy Joe Graven concerning his possible involvement in the inmate homicide. He was specifically asked to identify photos of the victim. He was further asked if the victim, Morrow, had sold his friends some bad dope. He was also asked to furnish an alibi for the time the homicide occurred.

(e) Ricardo Pineda concerning his possible involvement in the inmate homicide. He was specifically asked whether he knew the inmate and whether he had seen the victim at all on the morning of the homicide. He was further asked to give the committee an alibi for the time the homicide took place.

(f) Earl Lee Williams concerning his possible involvement in the inmate homicide. He was asked to account for the time during which he was missing from his institutional assignment. He was also asked how he had received a cut which he had on his forehead and to furnish an alibi for the time of the killing.

17. That on or about June 16, 1972, the adjustment committee did question plaintiff Alton B. Coleman concerning his alleged attempt to bribe another inmate to confess to the murder of Morrow. That on or about June 26, 1972, plaintiff Coleman was again brought before the adjustment committee and questioned concerning his possible involvement in the inmate homicide. He was specifically asked why he had attempted to bribe another inmate to confess to Morrow's murder. He was further asked to supply an alibi for the time that the homicide took place.

18. At no time were any of the plaintiffs herein warned by agents or employees of the United States Penitentiary, at Leavenworth, Kansas, that:

(a) They had a right to remain silent.

(b) Anything they said to the adjustment committee would be summarized in a report, and that these statements could later be used in a federal criminal prosecution.

(c) That they had a right to have an attorney present while being questioned by the adjustment committee and if they were too poor to retain an attorney, that one would be retained for them.

(d) That even if they began to answer questions, they could, nevertheless, refrain from answering further inquiries until they had consulted with an attorney and thereafter consented to be questioned.

19. That the only evidence that the adjustment committee received at the hearing conducted on or about June 16, 1972, and June 26, 1972, was:

(a) The report filed by H. D. Bailey and J. A. Junk on each individual plaintiff and the inmates' answers to the questions submitted by adjustment committee members.

20. That at the adjustment committee hearings, conducted on or about June 16, 1972, and June 26, 1972, in regard to each of the named plaintiffs, they were not permitted to:

(a) Cross examine either the individual who identified them as being active participants in some manner in the homicide of Elloyd Morrow, or the person who allegedly had been furnished with the information from the unidentified informer or informants.

(b) Present any witnesses on their behalf either in person or in the form of affidavits, although they were allowed to name any witnesses on their behalf for further investigation by the committee.

(c) To be represented by counsel while being questioned by either Lt. Junk or the adjustment committee concerning their possible involvement in the inmate homicide.

(d) To present any evidence to the committee other than their answers to the committee's questions.

(e) To have access to all relevant records and reports relied upon by the committee in reaching a determination.

21. The plaintiff Coleman was never informed of the charges against him prior to the time he was locked up and to his first adjustment committee hearing, both of which occurred on June 16, 1972.

22. That all the named plaintiffs had their reports read to them prior to their hearing on or about June 26, 1972.

23. That named plaintiffs never received any written copies of the reports that resulted in their confinement in one of the control units prior to their adjustment committee hearing.

24. That the adjustment committee has never issued a written report detailing the reasons for plaintiffs' continued confinement in control unit.

25. That among other functions of the adjustment committee, it is their function to make findings and to order release from the control unit those who are confined on reports that they find do not have any basis in fact.

26. That all named plaintiffs confined in Building 63 control unit or in the C block control unit, were treated in the exact same manner as other inmates confined in the Building 63 control unit or the C block control unit as a result of committing an act prohibited in a federal correctional institution or as a result of voluntarily being confined for their own protection or as a result of being detained for investigation for security reasons or for any other reason that other inmates were confined in those control units.

27. That plaintiffs, while confined in the segregation unit at the United States Penitentiary at Leavenworth, Kansas:

(a) Did not have physical access to the institution's law library or typewriter.

(b) Had their commissary spending limited to $10.00 a month. Inmates in population may spend $25.00 per month in the commissary plus an additional $15.00 per month for magazines, watches, and hobby craft items.

(c) Were restricted to two five-minute showers per week. Inmates in the general population may shower every day.

(d) Were permitted to exercise for approximately one hour per week in the exercise yard.

(e) Had the duration of their social visits reduced in time.

(f) Were not permitted to attend movies or any other recreational activities provided for inmates in the general population.

(g) Were denied permission to have and use their personal radios.

(h) Were denied the right to enjoy normal social intercourse with friends in the general population.

(i) Were denied the opportunity to earn industrial good time but continued to earn statutory good time and meritorious good time if they were receiving it before their confinement for the investigation purposes.

(j) Were denied the opportunity to pursue institutional, educational and vocational programs by physical attendance, although self-study was allowed.

(k) Were denied the opportunity to earn any money by working in the prison industries.

28. That the fact that an inmate has been placed in the control unit is entered in the inmate's record, which is made available to the United States Board of Parole together with related reports and facts.

29. That all pleadings submitted by either party together with any exhibit attached to any of the pleadings of either party, are to be admitted into evidence without objection from either party. That all reports and related information on file in regards to each named plaintiff, all exhibits and all discovery admissions and interrogatories on file be admitted into evidence without objection.

30. That Bureau of Prisons Policy Statement No. 7400.5A was in effect on the date that each named plaintiff was confined in the control unit and that Bureau of Prison Policy Statement No. 7400.5B was not yet implemented at any time relevant to these proceedings.

31. That all named plaintiffs were confined in Building 63 control unit or C block control unit for more than thirty (30) days. That plaintiff Graven was released from the control unit on 8–14–72; that plaintiff Brown was released from the control unit on 8–25–72, both named plaintiffs being returned to the general population of the United States Penitentiary at Leavenworth, Kansas.

32. That none of the named plaintiffs were interviewed by psychiatrists or psychologists while confined in segregation.

33. That plaintiffs, Joseph Harry Brown, George Shimabuku, and Tony Graven were never contacted or interviewed by the F.B.I. in regard to the homicide of Elloyd Morrow.

34. That all agents and employees of the United States Penitentiary at Leavenworth, Kansas, were at all times relevant to this action, acting as agents and employees of the United States Penitentiary at Leavenworth, Kansas, within the rules and regulations established by the United States Penitentiary at Leavenworth, Kansas, and the United States Bureau of Prisons.

35. The primary relevant rules and regulations are contained in Bureau of Prison Policy Statements 2200.1 issued 2–19–68 dealing with constitutional requirements and investigation of institutional crimes, and Policy Statement No. 7400.5A, dated 2–7–72, dealing with inmate discipline, which are contained in the file and neither party has objections to admitting it into evidence.

36. That the control unit at the United States Penitentiary at Leavenworth, Kansas, are often used for confinement of inmates for purposes other than punishment for violation of institutional rules.

37. That the internal security and discipline of the United States Penitentiary at Leavenworth, Kansas, is a matter delegated by law to the prison officials in their administrative capacities.