**John D. COLLIGAN, Petitioner,**

**v.**

**UNITED STATES of America, C. J. Hughes, Warden, Federal Correctional Institution, Milan, Michigan, Respondents.**

**Civ. A. No. 37587.**

United States District Court,
E. D. Michigan, S. D.

Sept. 22, 1972.

---

Martin Reisig, Detroit, Mich., for petitioner.

Ralph B. Guy, Jr., U. S. Atty., Barry Blyveis, Asst. U. S. Atty., Detroit, Mich., for respondents.

## MEMORANDUM OPINION

FEIKENS, District Judge.

John Colligan, petitioner, is an inmate of the Federal Correctional Institution at Milan, Michigan. Respondents are C. J. Hughes, Warden of that institution, and the United States of America.

■ Petitioner submitted a handwritten petition to this court, denominated as a "Motion for a Writ to Show Cause," alleging that authorities at the institution had violated his constitutional rights in punishing him for alleged violations of institutional rules. The court treats the pleading as a petition for a writ of habeas corpus. Prisoner petitions are to be liberally construed. Corby v. Conboy, 457 F.2d 251 (2nd Cir. 1972). See also Haines v. Kerner, 404 U.S. 935, 92 S.Ct. 290, 30 L.Ed.2d 248 (1972), and Kregger v. Posner, 248 F. Supp. 804 (E.D.Mich.1966).

Petitioner's specific claims are:

1. That without a hearing with adequate procedural safeguards, he was subjected to substantial punishment; namely, being placed in segregation for a two month period and being denied a date certain which had been set for his parole, and that these restrictions of his liberty constitute denial of due process of law;

2. That the conditions in the segregation unit in which he was placed constitute cruel and unusual punishment.

Since petitioner alleged the violation of what must be considered a fundamental right, due process, the court held an evidentiary hearing to ascertain the facts.

■ As noted by [then] Circuit Judge Blackmun:

". . . . The federal courts, including this one, entertain a natural reluctance to interfere with a prison's internal discipline. This is true with respect to federal institutions [citations omitted], as well as to state prisons [citations omitted]."

"However, the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and, where indicated, to grant relief." Jackson v. Bishop, 404 F.2d 571, 577 (8th Cir. 1968).

This court finds the facts to be as follows:

Colligan was due to be released on parole on December 10, 1971. On Friday, November 26, 1971, he was awakened before breakfast by an officer and informed that Corrections Supervisor (Lieutenant) Laird wanted to see him. Laird questioned petitioner as to a disturbance that had occurred the previous night, and about the possibility of a continuation of the disturbance that day at breakfast. Laird, apparently not satisfied with petitioner's answers, ordered Colligan "put in the hole."

On Monday, November 29, 1971, he was taken before "the adjustment committee." The exact makeup of the adjustment committee in petitioner's case is not known, but Chief Corrections Supervisor (Captain) Ralston was a member, and a caseworker was a member. The identity of the third member is uncertain, but Lt. Laird was present when Colligan was brought before the committee and may have been the third member.

The committee began questioning Colligan concerning the "disturbance" which occurred the previous Thursday night. When Colligan replied that he had not participated, the committee changed the subject of the questioning to Colligan's alleged participation in drug traffic within the institution. At this point Colligan testified that he thought he'd better "clam up." The committee also questioned Colligan concerning $2.00 in United States Currency [contraband within the institution] allegedly found in Colligan's jacket pocket. The jacket, among Colligan's belongings which were collected from his dormitory when he was sent to solitary, was found on Colligan's bed in the large dormitory room where Colligan was housed with a number of other inmates. Colligan was not wearing the jacket at the time; he was not there when it was found; and he was not shown the money that was allegedly found in his jacket.

When Colligan refused to answer any more questions, Captain Ralston ordered him returned to solitary and told Colligan he would have to remain there until he (Ralston) found out what was going on. Petitioner was in punitive segregation for almost a week and then in administrative segregation until January 28, 1972.

Mr. Gene Freeman, Chief of Case Management at Milan, testified that he was the caseworker who sat on petitioner's adjustment committee. Freeman testified that it was his recollection that the charge was possession of contraband. Upon reviewing the file in court, however, Mr. Freeman advised the court that the charge was actually that of creating a disturbance. So, while Colligan was questioned regarding three separate charges, then, and there was some confusion among members of the committee as to what the charges were, only the charge of creating a disturbance was actually before the committee and it was apparently on the basis of that charge alone that Colligan was punished.

As a result of the charges and petitioner's being placed in segregation, the institution recommended that the parole date be rescinded. The Parole Board did so order, and petitioner was not released.

## CONCLUSIONS OF LAW

Petitioner's contention that being placed in segregation constituted cruel and unusual punishment need not be reached. If called upon to decide the question, the court would not find the physical surroundings are so lacking in humaneness as to constitute cruel and unusual punishment. See Jones v. Wittenberg, 323 F.Supp. 93 (N.D.Ohio 1971), aff'd, sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972).

The major thrust of petitioner's complaint is the lack of procedural due process in the adjustment committee "hearing."

Prison inmates are, without question, entitled to protection by the courts.

"Prisoners do not lose all of their constitutional rights when they enter a penal institution. Rather they retain all of their constitutional rights except for those which must be impinged upon for security or rehabilitative purposes." Jones v. Wittenberg, *supra* at 98, cited with approval in Jones v. Metzger, *supra.*

See also Sharp v. Sigler, 408 F.2d 966 (8th Cir. 1969). The recent trend has been for federal courts to apply due process of law principles in penal institutions. See: Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Calif.1971); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971); and Lathrop v. Brewer, 340 F.Supp. 873 (S.D.Iowa 1972).

Colligan was not notified, either orally or in writing, as to the charges against him at any time prior to the hearing. He was in fact confronted with two charges of which he had no advance warning. There was no disclosure to him of the evidence against him. He was not even told who made the charges, or what tangible or testimonial evidence there was. The alleged contraband was

not produced in petitioner's presence, and no explanation or accounting for the money was made by prison officials during the evidentiary hearing. Petitioner was not allowed to confront and cross-examine witnesses against him, since he did not know who they were. And while he was allowed to make a statement as to his version of the facts, he was not allowed to present witnesses or prepare and present any documentary evidence.

He was not informed of his right against self-incrimination. He was not allowed counsel or counsel-substitute. He was not allowed to summon witnesses in his own behalf.

There were no written findings as to what Colligan was sent "to the hole" for. The prison authorities apparently "sentenced" Colligan for being accused, not upon a finding that he did any of the three things he was questioned about. The Board of Parole, too, unquestioningly accepted the institution's recommendation that the parole date be rescinded without any finding that Colligan violated institutional rules.

That petitioner suffered a loss is without question. He was placed in "segregation" in the Milan institution —a condition that, while not in and of itself cruel and unusual punishment, is a substantially more restricted and less pleasant condition than being in the general prison population. As a result of the actions of institutional authorities [ratified by the Board of Parole], Colligan was denied a date certain for release on parole and has served an additional nine months since that date. The court has been informed that there is little likelihood of release for petitioner prior to his normal release date. These are substantial deprivations. United States ex rel. Walker v. Mancusi, 338 F. Supp. 311 (W.D.N.Y.1971).

It remains for this court to determine what process is due. Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

■ This court does not, and will not, hold that the full panoply of due process

that is accorded in a criminal trial need be accorded a prisoner accused of a violation of prison regulations. Due process in a prison context is not, and cannot be, as extensive as due process in the context of a criminal trial, but prison authority must function within the bounds of constitutional responsibility. See Gilmore v. Lynch, 319 F.Supp. 105 (N.D.Cal.1970).

The question of what is minimal due process under similar circumstances has faced the courts before. Landman v. Royster, *supra*; Clutchette v. Procunier, *supra*; Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971). See also Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970); Smoake v. Fritz, 320 F.Supp. 609 (S.D.N.Y. 1970); Carter v. McGinnis, 320 F.Supp. 1092 (W.D.N.Y.1970).

This court, therefore, is not without guidance as to what constitutes due process in a prison setting.

Adequate due process safeguards in this institutional setting would be:

■ 1. A neutral and detached hearing board. From it should be excluded anyone who has personal knowledge of the incidents charged or anyone who has a "superior-subordinate" relationship to the accuser. An impartial decisionmaker is essential. Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Prison authorities would not, of course, be barred from sitting on adjustment committee hearings, but those sitting should not have any prior connection with the case, nor should those sitting be in a supervisory or subordinate position to those bringing the charges. This is necessary to eliminate the possible "command influence" which would otherwise be inherent in such a situation. See *Morrissey, supra; Bundy, supra; Goldberg, supra; Clutchette, supra.*

■ 2. Petitioner must be given written notice, prior to the hearing, of

the charges against him. This notice should include the rule which the inmate is charged with violating and a concise statement of the facts which allegedly constitute the violation. See cases cited in item 1 above.

3. The opportunity to confront the evidence against him. This includes the right to confront and cross-examine witnesses against him and to see tangible evidence. *Morrissey, supra; Goldberg, supra; Clutchette, supra.*

4. A right to summon his own witnesses, subject to appropriate limitations. Those within the institution, either inmate or staff, should not be too difficult to produce. Persons from the outside cannot, of course, be compelled to attend, but should be allowed to testify if they have relevant information. *Morrissey, supra; Goldberg, supra.*

5. The inmate should, as he was under then-existing procedures, be allowed to testify in his own behalf. He should not, however, be *forced* to testify, as apparently happened here.

6. The inmate should be entitled to inmate or staff counsel-substitute. In the case of the Milan Federal Correctional Institution, a potential resource of University of Michigan law students might also be used as counsel, as they are now being used to aid inmates in other areas (Michigan Inmate Assistance Program). *Clutchette, supra.*

7. The inmate is entitled to a written decision based upon, and only upon, the evidence presented. This should summarize the committee's findings and reasons for those findings. See *Morrissey, supra; Goldberg, supra; Clutchette, supra.*

Respondents have twice urged this court to dismiss this action as moot. The first time was when Colligan was released to the "control population." The second time was after the evidentiary hearing held by the court. Respondents have stated in a brief to the court that, "[t]he respondent has decided to withdraw from petitioner's prison records all references to the three charges of narcotics trafficking, creating a disturbance, and possession of contraband money." Respondents have further submitted what purports to be a copy of a memorandum from respondents to an official of the Board of Parole *recommending* that the Board review Mr. Colligan's case without reference to these charges.

Accordingly, it is the opinion of this court that if respondent causes all reference to the alleged charges against Colligan of creating a disturbance, trafficking in drugs, and possession of contraband be stricken from his institutional record and that he not suffer any further disability because of these charges, then the due process hearing hereinbefore referred to[1] need not be held.

---

1. Compare: Bureau of Prisons Policy Statement; Subject: Inmate Discipline, No. 7400.5B, 6-6-72, which reads in pertinent part:

\* \* \* \* \*

"5. ADJUSTMENT COMMITTEE. Basic authority for the administration of inmate discipline shall be delegated by the head of each institution to an Adjustment Committee and/or Treatment Team. The Committee shall consist of at last three members appointed by the head of the institution. This important responsibility must be placed in the hands of personnel who are competent and who broadly represent the primary areas of correctional treatment. One member shall be selected from the Correctional Service. Such delegation shall be accompanied by a specific charge which outlines duties and responsibilities in accordance with the following:

"a. *Functions.* The Adjustment Committee and/or Treatment Team shall receive reports of misconduct, conduct hearings, make findings, and impose disciplinary actions. The Committee shall, where indicated, refer violators for diagnosis of special handling. Where program changes are necessary it will make such adjustments as are within the authority or refer the matter to the appropriate Treatment Team or Committee. In addition, it will have responsibility for recommending to the Warden policies and operating procedures relating to discipline.

"b. *Dispositions.* The Adjustment Committee and/or Treatment Team has access to a broad range of dispositional alternatives. Included are direct referral to various institutional program and service resources, reprimand, restrictions of various kinds, segregation and recommending the withholding or forfeiture of good time. Program assignments and changes are to be recommended to the appropriate committee to achieve correctional goals not as punishment or reward. Consistent with the Policy Statement objectives of discipline, the choice of alternatives is a composite group judgment which takes cognizance of the reasons for the adverse behavior, the setting and circumstances in which it occurred, the involved inmate's accountability and the correctional program goals set for him. The choice of disposition goes far beyond mere compliance with regulations. To be fully effective, the inmate must understand and accept the reasonableness of the limitations being imposed upon him.

"c. *Procedural Requirements:* The Adjustment Committee and/or Treatment Team handling inmate discipline will adopt the following practices:

"(1) All inmates charged with misconduct or violation of a rule or regulation of the institution will be informed of the specific charges and will be given an opportunity to answer. The investigation of the charges and written notification to the inmate of the charges must be done within 24 hours of placement in segregation. The investigation shall be conducted by a member of the staff other than the reporting officer. Neither the reporting or the investigating officer shall be a member of the Adjustment Committee.

"(2) Adjustment Committees will meet no less than three times a week. All inmates in segregation status will be reviewed at least once a week on the record. At the time of this review, the Committee will determine if any program changes are needed, and will document the record accordingly.

"(3) Every inmate who spends over ten continuous days in segregation status will have his case formally reviewed by the Committee a second time and this review will be repeated at least every 30 days thereafter that the inmate remains in segregation. This means that the Committee will have the inmate appear before them or if the circumstances so dictate, the Committee will visit the inmate where he is being confined. If commitment to segregation continues beyond 30 days there will be a psychiatric or psychological interview. This interview and report should address itself particularly to the threat the inmate poses to himself or to others. The Committee's overall evaluation should also comment on the inmate's effect on the security or orderly operation of the institution. A similar interview and report shall be made no later than each six months thereafter.

The 10 day and 30 day reviews will be documented along with the Committee findings or decisions and will be sent to the next highest authority for review. The approval of the Committee's action will be indicated by the signature on the report of this person next highest in authority (e. g., Treatment Team actions could be reviewed by the Associate Warden. Adjustment Committees which include the Associate Warden would need to have actions reviewed by the Warden.) A copy of the 30 day review will be sent to the Assistant Director of Institutional Services.

"(4) If an inmate commits further offenses or violations while in segregation status, he shall appear before the Adjustment Board and/or Treatment Team, if the disposition is likely to result in extending his stay in segregation.

"(5) The disciplinary Committee reports will clearly state what happened (the offense), where it occurred, time it occurred, and any witnesses (staff or inmate). A statement from the inmate about the offense will also be included. A clear statement of the conclusions of the Committee, as to involvement in prohibited acts, the information upon which the conclusion is based, and its disposition will be included in the report. If the conclusions of the Committee as to either the findings or the disposition are not unanimous, this will also be recorded. All Committee members will sign the report. The inmate will be advised in writing of the Committee's decision. (The standard form to be used for this purpose is attached. Local reproduction of this form will be necessary until copies can be printed and mailed to each institution.)

"(6) Records of minor violations of the rules or regulations shall be maintained and a procedure established whereby disciplinary actions taken by a screening officer (e. g., Correctional Supervisor, Quarter Officer, Detail or Work Supervisor) are reviewed by the Chairman of the Adjustment Committee and/or Treatment Team."

Such seems to be the intent of the respondent.

However, if Colligan is to remain under any further disability by reason of these claims, he is entitled to a due process hearing forthwith in accordance with the guidelines set out herein.