Randolph WALKER, Plaintiff,

v.

Charles HUGHES, former Warden, and
Herb Beall, Individually and in his capa-
city as Warden of the Federal Correc-
tional Institution at Milan, Michigan,
Defendants.

Daniel S. BRIDGE, on behalf of himself
and all others similarly situated,
Plaintiffs,

v.

Charles HUGHES, former Warden, and
Herb Beall, Individually and in his ca-
pacity as Warden of the Federal Correc-
tional Institution at Milan, Michigan,
Defendants.

Melvin DRAIN, Plaintiff,

v.

Charles HUGHES, former Warden, and
Herb Beall, Individually and in his ca-
pacity as Warden of the Federal Correc-
tional Institution at Milan, Michigan,
Defendants.

Civ. A. Nos. 39765, 39834 and 40066.

United States District Court,
E. D. Michigan, S. D.

Dec. 2, 1974.

Martin I. Reisig, Detroit, Mich., for plaintiffs.

Gwenn L. Carr, Asst. U. S. Atty., Detroit, Mich., for defendants.

## SECOND MEMORANDUM OPINION

FEIKENS, District Judge.

This is a class action suit in which plaintiffs, residents of the Federal Correctional Institution at Milan, Michigan (Milan), allege that the procedures of the institution's adjustment committee deprive them of substantial rights without due process of law.[1] Following hearings, this court issued a Memorandum Opinion and Order in this matter on January 24, 1974, from which the defendants appealed. While the case was pending before the United States Court of Appeals for the Sixth Circuit, the United States Supreme Court delivered its opinion in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), a case concerned with similar issues. On September 26, 1974 the United States Court of Appeals for the Sixth Circuit, upon request of both parties, remanded this case to this court, and the parties were invited to submit briefs considering the effect of Wolff on this court's prior decision and order. On the basis of these new developments in the law, this opinion is issued in lieu of and superseding the opinion of January 24.[2]

1. This court was faced with a similar issue in Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972).

2. The findings of fact referred to herein are based on the evidence produced at the original hearing. Although an opportunity was

Milan is a medium security institution for young offenders. It has a range of rehabilitative programs for its inmates including educational and vocational training, psychiatric and psychological therapy, and recreational opportunities. Defendant Herbert Beall is the Warden of Milan, and is responsible for the administration of the institution.[3] The parties originally stipulated that plaintiffs Randolph Walker and Daniel Bridge were representatives of the class of plaintiffs consisting of all inmates at Milan subject to the adjustment committee. Several other inmates were added to this class as named parties during the course of this proceeding.

## I. *Findings of Fact*

*Plaintiff Walker*

1. Prior to February 7, 1973, plaintiff Walker was housed in the therapeutic community at Milan. Therein Walker enjoyed the benefits of freedom of movement within the unit, personal and group therapy, recreation, education and vocational training.

2. After an incident on February 7, 1973, Walker was placed in segregation and given a written incident report, written by guard Richard Cox, accusing him of assaulting another inmate during the incident.

3. Sometime on or before February 9, 1973, Walker's caseworker and counselor, Richard Rison, as well as Lieutenant Ashworth and Captain Yinger, questioned Walker concerning the incident.

4. Thereafter, at least four adjustment committee hearings were held concerning the Walker incident.[4] At the first, on February 9, 1973, the committee consisted of Rison, Dr. Weaver

(Chief Psychologist) and Mr. Edgington (Business Manager). Walker was instructed to tell his side of the story, which he did. No decision was reached at this hearing.

5. On February 12, 1973 a second hearing was held. The committee at this hearing consisted of Captain Yinger, Officer Friedman and Associate Warden Guienze. Walker repeated his story and no decision was reached.

6. On February 14, 1973 the committee met for the third time. The members of the committee were the same as those at the second hearing. Again no decision was reached.

7. Another hearing was held on February 16, 1973. This time the committee consisted of Captain Yinger, Warden Guienze and Caseworker Rison. At this hearing, Walker changed his story. At the fifth hearing he was informed of the committee's decision to recommend his transfer to the penitentiary at Terre Haute, Indiana. Later it was determined that Walker would be transferred to the federal penitentiary at Lewisberg, Pennsylvania, a maximum security institution.[5]

8. According to the committee's written finding of guilt in the Walker case, the finding was based on "information provided by investigation into the incident".

9. At some point the assault charge was referred to the Federal Bureau of Investigation for possible prosecution, but this was subsequently declined.

10. Walker was never told at any of the hearings: (a) that he could have counsel or counsel substitute; (b) that what he said might be used against him; (c) that he could confront his ac-

---

afforded to both parties after the remand to offer further evidence, none was tendered.

3. The suit was originally filed against Charles Hughes, the former warden at Milan. The parties stipulated to the substitution of party-defendant.

4. Findings of fact numbers 4, 5, 6, 7 and 9 are based on a stipulation of the parties.

Walker testified to somewhat different facts as to the committee membership at each of his hearings.

5. The court entered a preliminary injunction prohibiting this transfer. Walker resided in a segregation unit at Milan from February, 1973 until December of 1973 when he was released to the general population.

cuser; (d) that he could call witnesses in his defense; (e) that he could see the investigative reports.

*Plaintiff Bridge*

11. The parties stipulated to the following findings of fact with respect to Bridge:

"On or about January 17, 1973, Petitioner, DANIEL S. BRIDGE, was charged by the respondent or his authorized representative with five acts: (a) engaging in, or encouraging, a group demonstration; (b) refusing to obey an order from any staff member; (c) conduct which disrupts or interferes with the security or orderly running of the institution; (d) participating in an unauthorized meeting or gathering; and (e) assaulting a staff member.

"On the evening of January 18, 1973, Petitioner was informed of the charges against him.

"On January 22, 1973, before the 'adjustment committee', petitioner made a request to have counsel appointed to represent him.

"He (Petitioner) denied touching the officer in the above incident.

"Petitioner was found guilty of all offenses charged on January 17, 1973.

"Petitioner requested to confront the officer making the charges. The request was denied.

"As a result of these charges, Petitioner was confined to Administrative Segregation.

"He was not offered assistance of counsel or counsel substitute. He was not allowed the opportunity to call witnesses on his own behalf. Nor was he allowed to confront and cross-examine adverse witnesses.

"A member of the adjustment committee was Captain Yinger. Mr. Bridge's complaining officer on January 17, 1973, is Senior Correctional Officer, Bunkie Elliott.

"Petitioner originally filed his Motion for Writ of Habeas Corpus on or about March 21, 1973. Subsequently he was transferred to the Federal Correctional Institution at Terre Haute, Indiana, on April 13, 1973. He was confined to administrative segregation at Terre Haute from his arrival through May 21, 1973."

*Plaintiff Drain*

12. Prior to April 10, 1973, Drain was placed in the honor block at the institution. The benefits of this placement included an unlocked room and unlimited visitation by his family which resides in Detroit.

13. On April 10, 1973, Drain was charged with possession or introduction of any narcotic paraphernalia, and given written notice of the charge in an incident report.

14. The adjustment committee in Drain's case received the following report in an investigation into the incident:

"Drain has been named several times as the 'kingpin' in our drug activities in the Institution. He was suspected of pressuring inmates working in the business office to introduce contraband drugs. On one situation after receiving information that he had pressured an inmate for this purpose, a large amount of marijuana was found on a study release inmate that we suspect was intentionally dropped prior to search. Due to lack of conclusive evidence, we were unable to charge Drain with this incident. I might add that earlier this date there was a fight involving two unknown black inmates in F–1 Dormitory, the combatants ran from the dorm and could not be identified. Drain has a laceration on his leg and scratches on his hand that could have resulted from a fight."

Also, the investigator stated:

"It is the conclusion by this writer that DRAIN is the most active and powerful of the suspected drug dealers within the institution."

15. At the hearing Drain was asked to explain his side of the story and he

denied any connection with the incident. Drain wanted to call a witness on his own behalf but was not allowed to do this.

16. The committee found Drain guilty. In its written findings, the committee stated that this was based on the "incident report" and on "your statement", referring to Drain's denial.

17. Finding number 10, *supra*, applies to Drain.

18. Pursuant to the recommendation of the adjustment committee, Drain was transferred to the Federal Penitentiary at Terre Haute, Indiana, a maximum security institution for long term adults, and was held in segregation for considerable time upon his arrival.

*Witness Saxner*

19. Prior to August 17, 1973, witness Saxner was incarcerated at Milan. On that date he asked a prison employee, Lopez, about improperly handling a fellow prisoner. A discussion ensued; other inmates gathered. Lieutenant Edwards of the staff arrived, and asked Saxner to tell him what happened.

20. That afternoon, Saxner was called to Captain Yinger's office. Also in the office were Lieutenant Ashworth, Caseworker Rison and other officers. Saxner was given a written incident report charging him with threatening an officer, insolence toward a staff member and conduct which disrupts or interferes with the security or orderly running of the institution. Lopez was the accuser.

21. In Captain Yinger's office, Saxner was asked if he had anything to say, and he denied the allegations. Lieutenant Ashworth told him he was unsuited for Milan and that he was being transferred to the Federal Penitentiary at Terre Haute, Indiana immediately. This transfer was termed an "administrative" transfer, rather than one resulting from an adjustment committee finding of guilt. That day Saxner was transferred to Terre Haute.

22. Finding number 10, *supra* applies to Saxner.

23. At Terre Haute, Saxner has been kept in segregation. Part of the basis for this has been the August 17, 1973 incident report at Milan.

24. Saxner was never found guilty and never appeared before an adjustment committee denominated as such.

*Witness Horton*

25. Prior to August 21, 1973 Dale Horton was an inmate at Milan. On that date he was given an incident report charging him with conduct disruptive to the institution and encouraging a group demonstration. This charge was based on the discovery of three posters in Horton's locker. Identical posters were found throughout the prison that day. The posters stated "Unite, Do It Now, Fast".

26. The next day Horton appeared at the adjustment committee and was asked to give his version of the facts. He admitted possession of the posters, but stated he had found them.

27. Finding number 10, *supra*, applies to Horton.

28. The committee found Horton guilty on August 22. Part of the basis on which that finding was made was a rumor that Horton was a "troublemaker". (This was testified to by Captain Yinger.) Also cited in the incident report, as evidence of the incident, was the fact that a list of "addresses of several people and news medias from outside the institution" was found in the locker.

29. The committee decided that Horton should be transferred to the Federal Correctional Institution at Petersburg, Virginia.

30. The court finds that inmates at Milan are subject to three deprivations if found guilty by the adjustment committee: (a) Inmates may be placed in segregation where their rehabilitative programs are severely restricted. (b) Inmates may be transferred from Milan, a medium security, young adult facility, to a maximum security, long term adult facility. (c) Inmates' parole dates are adversely affected.

31. Further, the court finds that it is the practice of the administration at Milan in cases before the adjustment committee that a written incident report is given to the accused inmate, signed by the accusing staff member; that an investigation is undertaken and a statement is taken from the accused inmate; that the report of the investigation is given to the committee; that the committee asks the accused inmate his version of the facts; and that when a finding of guilt is made, it is based on the investigation report.[6]

32. Finally, the court finds that the administration at Milan in adjustment committee cases does not afford an accused inmate an opportunity to confront and cross-examine adverse witnesses, to call witnesses in his own defense, to remain silent, or to see investigation reports. Also, no attempt is made to provide a continuously identical panel of fact finders, or to exclude either staff who have investigated the incident, or the inmate's caseworker.

## II. *Discussion*

Plaintiffs contend that the substantial deprivations that they face if found guilty of infraction of prison rules require the prison's adjustment committee to accord them a panoply of due process rights similar to those mandated by *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Defendants originally claimed that those procedures outlined in finding 31 met minimal due process requirements. Following *Wolff*, however, the defendants tendered to the court Bureau of Prisons Policy Statement 7400.5c, Subject: Inmate Discipline, claiming that this statement outlined adequate due process procedures.

In analyzing this issue the court is now guided by the analysis in *Wolff, supra*. There the United States Supreme Court adopted an approach similar to that used in *Morrissey, supra*, first determining whether the complained of deprivations were substantial enough to deserve fourteenth amendment protection. Having found this to be the case, the Court proceeded to balance the competing interests in order to decide what process was due.

### A. *Nature of Claimed Deprivations.*

In *Wolff* the Court dealt with a situation in which inmates faced loss of "good time" credit which could affect the total length of incarceration.

■ Here plaintiffs claim three distinct deprivations occur: (1) Inmates' liberty is further restricted by placement into segregation. (2) Inmates are transferred from Milan to maximum security penitentiaries for long term adult offenders. (3) Inmates' parole dates are adversely affected. Though these are factors different than those in *Wolff*, the court is of the opinion that these deprivations are substantially within the meaning of *Morrissey* and that fifth amendment protection is due:

> "Whether any procedural protections are due depends on the extent to which an individual will be 'condemned to suffer a grievous loss.'" 408 U.S. at 481, 92 S.Ct. at 2600.

### B. *The Inmate's Interest in Remaining in the General Population.*

An inmate has a substantial interest in remaining in the general population or in one of the honor units at Milan. Once put in segregation, an inmate loses benefits[7] that are important to him; they form the very core of his rehabili-

---

**6.** These procedures then in effect are in substantial compliance with the Milan Institution Policy Statement; Subject: Inmate Discipline, MM 7400.1, 7–20–72. *See also*, Bureau of Prisons Policy Statement; Subject: Inmate Discipline, No. 7400.5B, 6–6–72, which is quoted at length in *Colligan, supra*, n. 1, 349 F.Supp. at 1238–1239, n. 1.

**7.** It does not matter whether these benefits are labeled "rights" or "privileges". *Morrissey v. Brewer*, 408 U.S. at 482, 92 S.Ct. 2593. *See also* Landman v. Royster, 333 F. Supp. 621, 651 (E.D.Va.1971).

tative program. These include psychological therapy, recreation and exercise, and education and vocational training. Perhaps more important is the substantial loss of freedom of movement. An inmate in segregation is allowed out of his cell only for visiting, showers, medical treatment and one hour of exercise per day, *See Wolff,* n.19.

An inmate who is transferred to a maximum security institution for long term adults sustains losses in addition to those discussed above. *See,* Capitan v. Cupp, 356 F.Supp. 302, 303 (D.Or. 1972); Gomes v. Travisono, 353 F.Supp. 457 (D.R.I.1973); White v. Gillman, 360 F.Supp. 64 (S.D.Iowa 1973). A most significant disadvantage is the change from confinement with inmates of similar age to confinement with inmates of older age.[8] Further, it is the practice of the prison authority at Terre Haute, to which two witnesses were transferred from Milan, to place transferees into segregation for a considerable time.

Finally, there is no dispute that the parole date of an inmate found guilty of a disciplinary infraction is adversely affected.[9]

■ These deprivations virtually end an inmate's rehabilitative program. The court concludes that the interests of an inmate in remaining in the general population, or in an honor unit, are substantial, and that minimal due process must be provided before he can be deprived of these benefits. It remains for the court to balance the interests involved to determine what constitutes minimum standards of due process in these circumstances.

## C. *Balancing the Interests.*

■ Chief Justice Burger stated in Morrissey v. Brewer, *supra,* 408 U.S. at 481, 92 S.Ct. at 2600:

"It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands."

The determination of what process is due must represent an accommodation between the institutional needs served by the adjustment committee and the inmate's interests which are affected thereby. *See Wolff,* 418 U.S. at 539, 94 S.Ct. 2963.

### 1. *The Function of the Adjustment Committee.*

■ The chief objectives of the processes of the adjustment committee are the security of the prison and the discipline (rehabilitation) of the inmates. The defendants argue, and the court agrees, that the prison administration needs a process for enforcing its rules, for the protection of the inmates, the administration and indeed society itself. Moreover, each inmate, as part of his rehabilitation program, needs to learn to live "by the rules" as a prerequisite to a successful life in society.

The prison administration is interested in a process that best advances the goals of internal security and inmate discipline. Such a process is one that operates swiftly and efficiently, for an inmate who knows that such a process will be visited upon him will be less likely to break the rules.

---

8. In 1972 the average age of prisoners at Milan was 23.5 years, while at Lewisberg the average age was 31.8. Federal Bureau of Prisons Statistical Report, 1972, at 34.

9. Disciplinary infractions and placement in segregation deprive an inmate of "the opportunity to appear under more favorable circumstances before the Parole Board for con-

sideration for release on parole". Carothers v. Follette, 314 F.Supp. 1014, 1027 (S.D.N.Y.1970). This also applies to youth offenders whose release dates are determined by the Youth Corrections Division of the Board of Parole under 18 U.S.C. § 5017(a). *See also* Clutchette v. Procunier, 328 F.Supp. 767, 777 (N.D.Cal.1971).

But the goals of internal security and inmate rehabilitation are also advanced by a process that provides optimum opportunity for an accurate determination of the truth of the accusation. An innocent inmate whose rehabilitation program is ended following an erroneous finding of guilt is an inmate quite likely to be beyond rehabilitation thereafter. The court emphasizes the rehabilitation objective of the Milan facility. *Cf.*, 18 U.S.C. §§ 4081 and 5011.

Also, in light of the rehabilitation objective, the prison administration should be interested in a process that gives the inmate the sense that his case is fairly and justly decided. Such a process can assist in the inmate's rehabilitation by teaching respect for law.

### 2. *The Interests of the Inmate.*

Turning now to the process in which the inmate is interested, it is apparent that he is likewise interested in accuracy, because of the nature and extent of the deprivations he may suffer.

He is also interested in efficiency. In addition to the concern caused by the pendency of the unresolved accusation, an inmate can reasonably be expected to suffer the anxiety of segregation that is commonly visited upon an inmate pending final determination of the charge. Also, as a result of segregation, an inmate's rehabilitation is interrupted and his release time may be affected.

### 3. *The Present Process.*

■ It is apparent to the court that the prison administration, in determining what procedures to incorporate into its adjustment committee process, places heavy emphasis on efficiency and ease of administration. The procedure in use consists of little more than written notice to the inmate and an opportunity for the inmate to make a statement. The court cannot sanction such a process. The process puts too little emphasis on accuracy, a goal in which both the inmate and the administration have a strong interest. More important, the process is one that makes no effort to instill in the inmate a sense of fairness and justice. It does not aid in his reconciliation to society.

While the interests of both the institution and the inmates are similar to those considered by the Supreme Court in *Wolff,* the circumstances are somewhat different. It is clear that the Supreme Court was laying down the minimum due process requirements for all types of corrective institutions:

> "[I]t is against this background that we must make our constitutional judgments, realizing that we are dealing with the *maximum security institution as well as those where security considerations are not so paramount."* *Wolff,* 418 U.S. at 562, 94 S.Ct. at 2978 (emphasis added).

In doing so, the Court emphasized that these standards are "not graven in stone". By contrast this court is confronted with the task of setting standards for one institution, and does so with the knowledge that this is not a maximum, but a medium security institution, designated for youthful offenders. Additionally, treatment and training are of prime importance at Milan (*see* 18 U.S.C. § 5011).

■■ Thus Milan, being a Federal Correctional Institution, is before this court in different posture than the state penal system examined in *Wolff.* Indeed, the fifth rather than the fourteenth amendment is involved. Though the due process clause of each amendment is often thought to be co-extensive, this is not always the case. *See* United States ex rel. Auld v. Warden of New Jersey State Pen., 187 F.2d 615 (3d Cir. 1951); French v. Barber Asphalt Paving Co., 181 U.S. 324, 21 S.Ct. 625, 45 L.Ed. 879 (1901). The close working relationship between the federal judiciary and the federal correctional system vests this court with a greater interest and expertise than exists between federal courts and state prisons. When a district court passes sentence under the Youth Corrections Act, 18 U.S.C. § 5010, it has a substantial interest in knowing

that the rehabilitative aspects of that sentence will not be changed without findings of fact. Against this background, and with the flexibility demanded by the due process clause in general, and *Wolff* in particular, this court must proceed to balance the interests.

D. *The Due Process Requirements.*

■ In determining what process is constitutionally due in such a prison setting the court is guided by the need for a compromise between efficiency and accuracy in the procedures of the adjustment committee. There can no longer be any doubt but that a prisoner is entitled to advance written notice of the charges. *Wolff, supra,* 418 U.S. at 539, 94 S.Ct. 2963.

A neutral, detached and continuously identical panel of fact-finders is also essential to an accurate determination of fact in each case. *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed. 2d 287 (1970). In *Wolff* the Court found the composition of the Nebraska Adjustment Committee to be constitutionally permissible, but did not prescribe standards by which courts could evaluate the composition of hearing boards in other cases. And, it must be noted that the chief corrections officer, who investigates complaints and conducts interviews with the accused inmate, was not a member of the committee approved in *Wolff*. Thus, this court concludes that from the adjustment committee must be excluded any employee who investigated the incident, as well as the accused inmate's caseworker (because of the confidentiality of the relationship). · This principle was violated in several respects in this case. Walker's caseworker, Rison, served on Walker's adjustment committee. Moreover, both Rison and Captain Yinger (who also sat on the committee) questioned Walker about the incident before the first hearing. The court notes that Walker's committee was not continuously identical at each of its several meetings. The requirement of continuity will not only aid in fact-finding accura-cy, but it will also make the process more efficient, and will help instill the sense of fairness that the inmate needs for his rehabilitation.

■ As well as having the right to make a statement in his own behalf, an inmate must be permitted to remain silent. Every inmate who testified stated that he was "instructed" or "requested" to tell his side of the story. Of course, taking advantage of the right to remain silent must not constitute an automatic waiver of defense.

At the hearing the accused inmate must also be entitled to make a statement in his own behalf. *See* Sostre v. McGinnis, 442 F.2d 178 (2nd Cir. 1971); Braxton v. Carlson, 483 F.2d 933 (3rd Cir. 1973).

An accused inmate still must be given a reasonable opportunity to present his side of the case through witnesses and documentary evidence and a reasonable opportunity to challenge the accusations made against him.

The right to present evidence is basic to a fair hearing, and is an essential requirement in any factual inquiry. This is especially true in a prison setting where the credibility of the accused inmate is subject to automatic doubt and where the accusing party is often a guard or prison employee. In recognition of this the Court in *Wolff* held:

> "We are also of the opinion that the inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979.

This court understands the need to give the adjustment committee discretion in limiting the number of witnesses that may be called and the length and scope of the questioning. On rare occasions the board may be justified in refusing an inmate the right to call any witnesses when institutional security would be jeopardized thereby. However, due process does not permit the automatic

exclusion of the right to call witnesses as was the case at Milan. (Finding 32.) Since denying an inmate the right to call any witnesses seriously affects the fact-finding integrity of the hearing, it should be resorted to only upon a written determination that such action is mandated by security considerations. Additionally, this court joins with *Wolff* in suggesting, though not requiring, that the reasons for refusing to call any witness be documented in the record.

■ *Wolff* held that cross-examination was not constitutionally compelled at the present time. While leaving the allowance or denial of cross-examination to the discretion of state officials, the Court did not prescribe any method by which the soundness of this discretion could be subjected to scrutiny. In the post-*Wolff* case of Clutchette v. Procunier, 510 F.2d 613 (9th Cir. 1974), the United States Court of Appeals for the Ninth Circuit held that the adjustment committee must state on the record the reasons for not allowing cross-examination:

> "Whenever a prisoner requests and is denied the privilege of confrontation and cross-examination in a disciplinary proceeding in which a serious sanction can be imposed . . . the prison authorities must enter in the record of the proceeding and make available to the prisoner an explanation for the denial. . . ." 510 F.2d 616.

Because of the importance of cross-examination as a tool for determining the truth underlying allegations of impropriety, this court strongly urges that cross-examination be made a part of every hearing. However, in those cases where the prison officials feel that cross-examination would pose a serious threat to institutional security, this court joins with the United States Court of Appeals for the Ninth Circuit in requiring that such reason appear in the record. This practice will provide a method by which both parole boards and courts may monitor institutional discretion.

■ While not making cross-examination of all witnesses a requirement in prison disciplinary hearings, the Supreme Court in *Wolff* did sanction a limited confrontation of the accusing party:

> "We note that though Nebraska does not as a general matter allow cross-examination of adverse witnesses at the hearing before the Adjustment Committee, the inmate is allowed to ask the charging party questions about the nature of the charges. . . ." *Wolff,* n.17.

The inmates at Milan, however, did not have this significant right, and this court finds that to be a constitutional deficiency. In the absence of cross-examination due process requires that the accused inmate have the right to challenge the truth of the accusation by questioning the officer writing up the incident report. In the medium security setting of Milan this practice will not impair the objectives of prison administration and will further the fact-finding function of the committee. The officer will be able to withhold the identity of unknown informers and maintain the confidentiality of other facts essential to prison discipline. On the other hand, the accused inmate will be able to learn the true nature of the charges, will be able to point up inconsistencies in the accusation, and will be able to separate opinion and rumor from actual observed misbehavior. Such a right is invaluable. *See, for example,* findings 14 and 28, *supra.*

■ The Supreme Court has already ruled that counsel or adequate counsel substitute must be provided to an inmate facing disciplinary charges if: (a) the inmate is illiterate or (b) the issues are complex. *Wolff,* 418 U.S. at 539, 94 S.Ct. 2963. To this list must be added the requirement that counsel or counsel substitute be provided to any inmate who for security reasons is denied the right to present witnesses in his own behalf. Additionally, the court encourages, though does not require, that any

inmate facing serious deprivations be afforded the assistance of an attorney, fellow inmate or prison employee. Such a procedure should aid the fact-finding process without burdening resources or lengthening the hearing.

Finally, a written statement of the decision of the fact-finders and the evidence relied upon must be made. *Wolff,* supra, 418 U.S. at 539, 94 S.Ct. 2963.

The decision of the adjustment committee must be based upon, and only upon, the evidence. Several violations of this principle occurred in the case. Several inmates were found guilty on the basis of the accusation itself. Also, part of the basis for the finding of guilt in Drain's case was rumor and opinion concerning Drain's drug activities. A written decision summarizing the evidence and the reasons for the decision will force a close scrutiny of the evidence, without burdening the process.

 These procedures should be employed in every case in which an inmate faces segregation, transfer from Milan to a maximum security penitentiary for adult offenders, or any action having significant adverse effect on parole. The court recognizes the need for segregation of an accused inmate pending final determination. In such a case, however, he should retain as many privileges as possible and the hearing process should commence as soon as is reasonably possible. Except in cases of insurrection or riot, there should not be call to transfer an inmate for punitive reasons without a prior hearing. Nor can the administration avoid constitutional due process requirements by labeling a transfer "administrative" rather than "disciplinary" as happened in Horton's case.

In order to be effective, these rights must be explained to an inmate, either orally or in writing, before he appears before the committee.

### III. *Conclusions of Law*

1. The nature and extent of the deprivations visited upon an inmate found guilty by the adjustment committee are such that the due process clause of the fifth amendment applies to adjustment committee processes.

2. The process employed at the time of this case by the prison administration at Milan does not comport with due process in that it gives too much weight to efficiency and ease of administration and insufficient weight to the accuracy of the process and the desirability of instilling a sense of fair play into the inmate, in light of the rehabilitation objective of Milan.

 3. Due process in the circumstances of this case require that before an accused inmate be placed in punitive segregation,[10] be transferred to a maximum security penitentiary for adult offenders, or have his parole date significantly and adversely affected, he must be afforded: (a) written notice of the charges; (b) a neutral, detached and continuously identical panel of fact-finders, from which must be excluded investigators and the accused inmate's caseworker; (c) the opportunity to remain silent; (d) the opportunity to confront and question the officer writing up the incident report; (e) the opportunity to make a statement in his own behalf; (f) the opportunity to call witnesses and present evidence in his defense unless the record clearly indicates that to do so would present a grave threat to institution security; (g) counsel or counsel substitute if the case is complex, the inmate is illiterate, or the right to call witnesses has been denied; (h) a written decision based upon and only upon the evidence; (i) oral or written notice of procedural rights; (j) a hearing as soon as possible following an alleged incident. Additionally, if institutional authorities exercise their discretion to preclude cross-examination, their reasons should appear in the record.

10. *See* (j), *infra.*

**44**

### IV. *Application and Retroactivity*

 The Supreme Court declined to make the holdings of *Wolff* retroactive, stating that:

> "On the whole, we do not think that error was so pervasive in the system under the old procedures to warrant this cost or result." 418 U.S. at 574, 94 S.Ct. at 2983.

In the case at bar, both the cost of a retroactive ruling, and the chance of error under the old system are different from the situation in *Wolff*. The burden is less onerous since this court's order of February 22, 1974 has already made it necessary to identify those named plaintiffs who were affected. By stipulation of the parties and pending the appeal formerly taken, letters have already been entered into the files of each of these inmates, indicating to parole boards that the results of the disciplinary hearings had been declared invalid by this court. More important, though, the procedures used by Milan are not even as dependable as those of the pre-*Wolff* Nebraska system. As already pointed out, there was no opportunity for the accused inmate to question the officer writing the report; in at least one case the composition of the hearing board changed during the course of the hearings and rumor and opinion formed part of the basis for the opinion in at least one instance. These circumstances force this court to conclude that the procedures of Milan's adjustment committee gave rise to a strong possibility of arbitrary results. Accordingly, the court will order the return to Milan of the named plaintiffs who have been transferred to Terre Haute. Additionally, the court will order the reinstatement of each named plaintiff to the status and quarters he occupied prior to the alleged incident, unless the prison administration affords the inmate a new hearing which fully complies with the mandates of this opinion. The court will order each named plaintiff's prison record expunged of any record of any hearing that does not comply with this opinion. Finally, the court notes that this is a class action and that the remedial procedures herein discussed apply to all members of the class.

An appropriate order may be submitted.